A10A1444, A10A1445. IN THE INTEREST OF T. B. R., a child
(two cases).
(697 SE2d 878)

BLACKBURN, Senior Appellate Judge.

Following the termination of their parental rights to ten-year-old T. B. R., both the mother and the putative father appeal. In Case No. A10A1444, the mother challenges the sufficiency of the evidence supporting the juvenile court's judgment and argues that the court erred in failing to require the Department of Family and Children Services ("DFCS") to make an exhaustive search for family placement for T. B. R. and in failing to require DFCS to pursue alternatives to termination. In Case No. A10A1445, the father similarly challenges the sufficiency of the evidence and further argues that the juvenile court erred in denying his motion for a continuance of the termination hearing and in failing to produce him from prison for earlier deprivation hearings. We have consolidated the parents' cases for review, and, for the reasons set forth below, we affirm in each case.

"We review an order terminating parental rights in a light favorable to the juvenile court's ruling to determine whether the finder of fact could have found by clear and convincing evidence that the parents' rights to custody should be terminated." *In the Interest of A. G.*[1] "In so doing, we do not weigh the evidence or determine the credibility of witnesses; rather, we defer to the juvenile court's factfinding and affirm unless the appellate standard is not met." *In*

---

[1] *In the Interest of A. G.*, 293 Ga. App. 493 (667 SE2d 662) (2008).

*the Interest of B. W.*[2] "Nonetheless, we are mindful that because no judicial determination has more drastic significance than permanently severing a parent-child relationship, such severance must be exercised cautiously and scrutinized deliberately." (Punctuation omitted.) *In the Interest of J. K.*[3]

Viewed in the favor of the juvenile court's judgment, the evidence shows that on January 25, 2007, the juvenile court entered a shelter care order as to then seven-year-old T. B. R. based on the fact that his mother, who had been in a drug abuse treatment center, had been hospitalized to undergo gall bladder surgery, his father was incarcerated, and there were no relatives capable of caring for the child. The next day, the court held a 72-hour hearing and granted custody of T. B. R. to DFCS after finding that T. B. R.'s mother would need six weeks to recuperate from surgery, that his father was currently incarcerated, and that no relatives were able to care for T. B. R., who had been diagnosed as autistic.

On March 9, 2007, DFCS developed a reunification case plan for the mother, which required her to complete parenting classes geared toward caring for special needs children, meet with a psychotherapist to determine whether she needed treatment for depression, obtain and maintain stable housing and income, successfully complete substance abuse treatment and remain drug and alcohol free for six consecutive months, and submit to random drug screens. At the same time, DFCS developed a similar plan for the father, which required him to successfully complete a psychological evaluation, obtain and maintain stable housing and income, successfully complete substance abuse treatment and remain drug and alcohol free for six consecutive months, and submit to random drug screens.

After several adjudicatory hearings, on April 17, 2007, the juvenile court entered a provisional order finding that T. B. R. was deprived. In support of its order, the court found that the mother had admitted to having a substance abuse problem, for which she had been in residential treatment since May 2006 and that T. B. R. had been living with her prior to her surgery. The court further found that the mother and father had been in a 14-year relationship but were not married, that the father had been convicted of cruelty to children as to T. B. R.'s older sister, for which he received a ten-year sentence with one year to serve, and that the father was currently incarcerated due to a violation of his probation. In addition, the court determined that the father had a substance abuse problem. On April 23, 2007, the court conducted another hearing, after which it ordered

---

[2] *In the Interest of B. W.*, 287 Ga. App. 54, 62 (651 SE2d 332) (2007).
[3] *In the Interest of J. K.*, 278 Ga. App. 564, 565 (629 SE2d 529) (2006).

that all of the findings of its provisional order be incorporated into its final order, including its finding that T. B. R. was deprived, and that T. B. R. remain in the temporary custody of DFCS. Neither parent appealed that order.

On November 16, 2007, the juvenile court held a status hearing, after which it issued an order finding that T. B. R. was doing well in foster care and that DFCS was continuing to assist the mother with housing and employment but that she did not have sufficient income to provide for T. B. R.'s needs. The court also found that the father had recently been released from incarceration but had not addressed his substance abuse problem. The court further found that the father had not legitimated T. B. R. and informed the father during the hearing that he would risk having his parental rights terminated if he did not file a petition to legitimate the child within 30 days. In January 2008, the juvenile court held hearings on DFCS's motion for continued findings of deprivation and for extension of custody and found that the mother had participated in some aspects of the reunification case plan but still had not maintained stable employment and did not have consistent reliable transportation. In addition, the court found that the mother had not demonstrated the ability to care for the child for an extended visit. With regard to the father, the court found that he had not been provided with his case plan due to his incarceration and ordered him to contact the DFCS case manager to develop his plan. Neither parent appealed these orders finding continued deprivation.

From January 2008 through May 2009, the juvenile court conducted numerous judicial reviews of the status of the case. During this time period, the father was again informed that he needed to legitimate T. B. R. After the May 2009 hearing, the court concluded that the mother had made minimal progress on her reunification case plan and that the father had made no progress on his case plan. On May 19, 2009, DFCS filed a petition for the termination of both parents' parental rights as to T. B. R., alleging that neither parent had fully complied with the requirements of their case plans and that neither had paid child support for T. B. R. Additionally, DFCS served the father with notice that he would lose all parental rights to T. B. R. if he did not legitimate the child.

Over the course of several days in September and October 2009, the juvenile court held a hearing on the petition to terminate the mother's and father's parental rights as to T. B. R. During the hearing, a licensed psychologist, who evaluated the mother, testified that he had conducted several tests on the mother that measured her potential for engaging in abusive behavior toward her child and that the results of those tests indicated an elevated potential for abuse. He further testified that the mother's IQ was in the borderline range

of intelligence and characterized her as intellectually challenged and prone to childlike behavior. In addition, the psychologist testified that although the mother had abstained from drug use for nearly a year, her denial that she had ever had a drug problem concerned him because it indicated that she lacked the vigilance necessary for permanent abstinence. Finally, the psychologist opined that based on the mother's level of intellectual and emotional functioning, it would be very difficult for her to supervise or care for an autistic child.

Two DFCS caseworkers, who had been assigned to the matter, testified that the mother had failed to comply with her plan's requirement that she maintain stable housing and stable income. Both caseworkers also testified that the father had made no progress on his case plan. The caseworker who was initially assigned to T. B. R. testified that the mother had completed her psychological evaluation but had not completed the parenting classes or psychological counseling required by the plan. She also noted that DFCS had attempted to assist the mother in obtaining medication for her depression, social security benefits, and vocational rehabilitation, but that the mother had not taken advantage of that assistance. The initial caseworker also explained that she was no longer the caseworker for T. B. R. because she had been transferred to the adoptions unit of DFCS. She stated that she believed that DFCS could find adoptive parents for T. B. R. with specialized training for caring for autistic children and that it was in T. B. R.'s best interest for DFCS to do so.

T. B. R.'s current caseworker testified that although the mother claimed that she recently had been employed cleaning houses, the mother never provided any proof of income. In addition, the mother had not provided proof that she had fully complied with her plan's requirement that she continue with drug abuse counseling and individual psychotherapy. As for T. B. R., the current caseworker testified that he was enrolled in a special needs class and was doing very well. Specifically, T. B. R. had become more vocal and his speech had become more understandable. Additionally, T. B. R. had progressed in his ability to control his behavior and in his ability to perform daily functions such as dressing himself and maintaining personal hygiene. Finally, the current caseworker testified that she did not believe that either T. B. R.'s mother or his father would be able to meet the child's needs, and, therefore, it was in T. B. R.'s best interest to be adopted by a family that could do so.

A psychologist, who specialized in providing therapy for children with autism, testified that she had evaluated T. B. R. in February 2009, and that she had diagnosed him as having an autistic disorder and possibly post-traumatic stress disorder. More specifically, she had found that T. B. R. had poor speech and language skills and significant developmental delays in most areas of functioning com-

pared to an average ten-year-old child. Importantly, the psychologist testified that T. B. R. required a caretaker who could be consistently involved in participating in his educational plan and in teaching him how to function in mainstream society. She also opined that the average parent would have difficulty taking care of an autistic child and that a parent with a mental or emotional impairment would find it "very, very hard" to do so.

At the termination hearing, the mother testified that she and the father had recently signed a lease on an apartment together. The mother further explained that the father was employed on an out-of-town construction job during the week but came home on the weekends and would be living with her and her daughter permanently once his job had concluded. When questioned about the father's criminal history, the mother responded evasively, threatened to leave the courtroom, and asked why she had to answer questions about the father. Eventually, she acknowledged that the father had been incarcerated on several occasions and had been convicted of cruelty to children as to the daughter with whom he would be living. However, she claimed that she was unaware of whether the father still had a drug problem or whether he had ever attended counseling. Additionally, the mother conceded that she had not fully complied with her case plan and, specifically, that she had not maintained stable housing or stable income. When questioned about whether she received some income from social security benefits for her daughter, the mother became belligerent and again asked why she was being forced to answer such questions.

The father also testified at the termination hearing and conceded that he had been incarcerated on several occasions over the last two years. In addition, the father testified that he had never legitimated T. B. R., despite being told by the court to do so at an earlier hearing, and he offered no explanation for his failure to legitimate. The father further admitted that he had never paid any child support for T. B. R. and had not complied with the requirements of his case plan.

On the final day of the termination hearing, the guardian ad litem for T. B. R. recommended against termination of the mother's parental rights. In support of her recommendation against termination, the guardian ad litem noted that the mother had nearly always attended her visitations with T. B. R. and that she had formed a strong bond with her son. Furthermore, the guardian ad litem expressed concern regarding the fact that T. B. R.'s current foster home would not be adopting him, and that DFCS had not yet located a family that could adopt the child. She also argued that requiring T. B. R. to move again would stifle the progress that he had been making in coping with his condition.

On November 20, 2009, the juvenile court issued an order terminating both the mother's and the father's parental rights as to T. B. R. Thereafter, the mother and father filed separate applications for discretionary appeals, which this Court granted. These appeals followed.

*Case No. A10A1444*

1. The mother contends that insufficient evidence supported the juvenile court's decision to terminate her parental rights as to T. B. R. Specifically, she argues that the juvenile court's decision should be reversed because evidence showed that she had a strong bond with T. B. R. and had completed most of her case plan, because there was no evidence that she was presently unfit, and because there was no evidence that continued deprivation would likely harm the child. We disagree.

In a termination of parental rights case, OCGA § 15-11-94 (a) requires the juvenile court to consider whether there is clear and convincing evidence of parental misconduct or inability as provided in subsection (b) of that Code section. If such is shown, then the court considers whether termination of parental rights is in the best interest of the child.

Subsection (b) of the statute sets forth four criteria that must be proven for the trial court to conclude that parental misconduct or inability is shown. Although the four criteria are separately listed, often they overlap, thus allowing evidence displaying one of the criteria to prove or at least partially prove one or more of the other criteria. The four criteria that the court must find in order to hold that parental misconduct or inability is shown are:

> (i) The child is a deprived child, as such term is defined in Code Section 15-11-2;
>
> (ii) The lack of proper parental care or control by the parent in question is the cause of the child's status as deprived;
>
> (iii) Such cause of deprivation is likely to continue or will not likely be remedied; and
>
> (iv) The continued deprivation will cause or is likely to cause serious physical, mental, emotional, or moral harm to the child.

OCGA § 15-11-94 (b) (4) (A).

(a) *Deprivation.* To show that T. B. R. was deprived under the circumstances here, DFCS was required to present evidence that he

was "without proper parental care or control, subsistence, education as required by law, or other care or control necessary for the child's physical, mental, or emotional health or morals[.]" OCGA § 15-11-2 (8) (A). As explained in *In the Interest of P. D. W.*,[4] where the child has been in DFCS's care, the correct inquiry is whether the child *would be* deprived if returned to the parent's care and control as of the date of the hearing. Under this analysis

> this Court has repeatedly held that unappealed deprivation orders are binding on the parent insofar as they establish that the existence of certain conditions (at the times those orders were entered) constituted a binding showing that the child was deprived as defined under the law; but only upon a *further* showing by the department that the conditions upon which this finding was based still exist at the time of the hearing on the termination petition will this criterion be met.

(Emphasis in original.) *In the Interest of K. R.*[5] In this matter, DFCS did just that.

"One factor that juvenile courts must consider in determining whether a child lacks proper parental care and control is whether the parent possesses a medically verifiable health deficiency of such nature or duration as to render the parent unable to provide adequately for the child's needs." *In the Interest of A. K.*[6] See OCGA § 15-11-2 (8) (A). Here, the psychologist who evaluated the mother testified that she had borderline intellectual functioning and elevated scores on the child abuse potential inventory test to the extent that she was at high risk of engaging in acts of physical child abuse. He also opined that the mother's denial that she had a substance abuse problem caused him to doubt whether she could remain abstinent. The psychologist further stated that in light of the mother's intellectual and emotional deficiencies, it would be very difficult for her to care for an autistic child.

Another factor that a court must consider is whether the parent complied with "a court ordered plan designed to reunite the child with the parent." OCGA § 15-11-94 (b) (4) (C) (iii). Here, DFCS presented evidence that the mother had failed to fully comply with the requirements of her case plan in that she had not maintained stable housing and income and had failed to complete parenting classes, follow-up treatment for substance abuse, and individual

---

[4] *In the Interest of P. D. W.*, 296 Ga. App. 189, 191 (1) (a) (674 SE2d 338) (2009).

[5] *In the Interest of K. R.*, 298 Ga. App. 436, 439 (1) (a) (680 SE2d 532) (2009).

[6] *In the Interest of A. K.*, 272 Ga. App. 429, 434 (1) (a) (612 SE2d 581) (2005).

psychological counseling. Accordingly, the evidence sufficiently demonstrated that T. B. R. was deprived. See *In the Interest of A. R.*[7] (mother's failure to obtain stable income and housing and her mental limitations, which prevented her from making good decisions, was sufficient evidence of deprivation).

(b) *Lack of parental care or control as cause of the deprivation.* Under the second criterion of subsection (b) (4) (A) of the statute, DFCS had to show that "[t]he lack of proper parental care or control by the parent in question is the cause of the child's status as deprived." OCGA § 15-11-94 (b) (4) (A) (ii). As stated in *P. D. W.*, supra, 296 Ga. App. at 193 (1) (b), the question is whether,

> *if returned to the parent as of the date of the hearing*, the child would return to a state of deprivation because of the parent's lack of proper parental care or control. In making this determination, the juvenile court focuses on the various factors as set forth in OCGA § 15-11-94 (b) (4) (B) and (b) (4) (C).

(Emphasis in original.)

The factors relevant to this case are found in two parts of the statute. OCGA § 15-11-94 (b) (4) (B) (i) provides that a court may consider "[a] medically verifiable deficiency of the parent's physical, mental, or emotional health of such duration or nature as to render the parent unable to provide adequately for the physical, mental, emotional, or moral condition and needs of the child." OCGA § 15-11-94 (b) (4) (C) (iii), provides:

> [W]here the child is not in the custody of the parent who is the subject of the proceedings, in determining whether the child is without proper parental care and control, the court shall consider, without being limited to, whether the parent without justifiable cause has failed significantly for a period of one year or longer prior to the filing of the petition for termination of parental rights: . . . [t]o comply with a court ordered plan designed to reunite the child with the parent or parents. . . .

Here, as noted above, the evidence showed that the mother's intellectual and emotional deficiencies would make it very difficult for her to care for an autistic child. Additionally, as also noted above, the mother had not fully complied with numerous elements of her

---

[7] *In the Interest of A. R.*, 302 Ga. App. 702, 707-708 (1) (a) (691 SE2d 402) (2010).

case plan. Furthermore, the mother was living with the putative father who had not completed any part of his case plan and had abused T. B. R.'s older sister, yet she expressed no qualms about subjecting T. B. R. to such living conditions. Thus, the evidence supported a finding that the second criterion was met. See *K. R.*, supra, 298 Ga. App. at 441 (1) (b); *In the Interest of M. L.*;[8] *A. K.*, supra, 272 Ga. App. at 434-435 (1) (a).

(c) *Cause of the deprivation is likely to continue.* DFCS was then required to show the third factor: "Such cause of deprivation is likely to continue or will not likely be remedied." OCGA § 15-11-94 (b) (4) (A) (iii). As stated in *P. D. W.*, 296 Ga. App. at 194 (1) (c), "[t]his criterion focuses on whether, as of the date of the termination hearing, the parent is likely to continue conduct causing deprivation." Here, the mother argues that the juvenile court's finding that the deprivation was likely to continue was improperly based on past unfitness alone. We disagree.

"It is well settled that the juvenile court may consider the parent's past conduct in determining whether deprivation is likely to continue." (Punctuation omitted.) *In the Interest of M. J. G.*[9] In addition, "repeated failure to comply with case plan goals may show that the cause of the deprivation is likely to continue." (Punctuation omitted.) *P. D. W.*, supra, 296 Ga. App. at 194 (1) (c). Again, DFCS showed just that. Specifically, DFCS showed that the mother had not completed parenting classes that would teach her how to care for an autistic child and had not attended individual psychological counseling as required by her plan. Furthermore, she had not maintained stable housing and income as also required by the plan. Although the mother presented evidence that she had recently signed a lease for an apartment with T. B. R.'s father, the father had been convicted of abusing her older child, and she admitted that her only income came from part-time work cleaning houses and that the father (to whom she was not married) was paying most of the rent. Under these circumstances, neither her housing nor her income could be considered stable. See *A. R.*, supra, 302 Ga. App. at 709 (1) (c); *P. D. W.*, supra, 296 Ga. App. at 193 (1) (a); *In the Interest of J. M. N.*[10] Thus, the third criterion was met.

(d) *Likelihood of harm.* The mother further contends that DFCS failed to present any evidence that T. B. R. would suffer harm if he were returned to her. This contention, however, is contravened both

---

[8] *In the Interest of M. L.*, 290 Ga. App. 437, 440-441 (2) (659 SE2d 800) (2008).

[9] *In the Interest of M. J. G.*, 288 Ga. App. 754, 755 (655 SE2d 333) (2007).

[10] *In the Interest of J. M. N.*, 285 Ga. App. 203, 207 (3) (645 SE2d 685) (2007).

by the record and by relevant case law.

> This fourth criterion for the termination of parental rights is most often a syllogism. Since "deprivation" by definition usually means that the child lacks the parental care or control necessary "for the child's physical, mental, or emotional health or morals" (OCGA § 15-11-2 (8) (A)), then the continuation of that deprivation will likely cause "serious physical, mental, emotional, or moral harm to the child."

(Punctuation omitted.) *A. R.*, supra, 302 Ga. App. at 711 (1) (d). Accordingly, this Court has "recognized that the same facts that support a juvenile court's conclusion that a child is deprived and that the deprivation is likely to continue if placed with the parent also support a conclusion that continued deprivation would likely cause the child serious harm." *In the Interest of K. A. S.*[11]

In this matter,

> [g]iven the mother's failure to address the most significant requirements of her case plan and the evidence showing that her mental limitations prevented her from properly parenting the children, the evidence was sufficient to demonstrate that the children's continued deprivation will cause or will likely cause the children serious physical, mental, emotional, or moral harm.

(Punctuation omitted.) *A. R.*, supra, 302 Ga. App. at 711 (1) (d).

(e) *Best interest of the child.* The mother argues that the juvenile court erred in finding that the termination of her parental rights was in the best interest of T. B. R. because, in doing so, the court ignored the evidence that the mother and T. B. R. had a strong bond and ignored the recommendation of the guardian ad litem that the mother's rights not be terminated. We disagree.

"To determine whether termination of parental rights is in the best interest of the child, the court shall consider the physical, mental, emotional, and moral condition and needs of the child, *including his or her need for a secure and stable home.*" (Punctuation omitted; emphasis supplied.) *In the Interest of D. B. C.*[12] See *In the Interest of K. A. C.*[13] In making this determination, "[a] juvenile court has broad discretion . . . , and we will not reverse in the absence of manifest abuse of that discretion." (Punctuation omitted.) *In the*

---

[11] *In the Interest of K. A. S.*, 279 Ga. App. 643, 651 (1) (d) (632 SE2d 433) (2006).

[12] *In the Interest of D. B. C.*, 292 Ga. App. 487, 497 (2) (664 SE2d 848) (2008).

[13] *In the Interest of K. A. C.*, 290 Ga. App. 310, 314 (5) (659 SE2d 703) (2008).

*Interest of D. P.*[14]

"When ascertaining the best interests of the child, the juvenile court may consider the same factors that supported its finding of parental inability." (Punctuation omitted.) *A. R.*, supra, 302 Ga. App. at 712 (3). "And, the juvenile court is authorized to consider a child's special needs and the parent's inability to provide for those needs." *B. W.*, supra, 287 Ga. App. at 64 (3). See *In the Interest of M. W.*[15] As discussed supra, the evidence as to these factors demonstrated that

> the mother is physically, emotionally and financially unable to manage her own life, even without the added burden of a child with special needs. There is no indication that the mother will be prepared in the near future to care for [T. B. R.] and to provide for [his] medical, emotional and educational needs. And, the evidence shows that it would be in [T. B. R.'s] best interest to be in a permanent, structured environment.

*A. K.*, supra, 272 Ga. App. at 438 (1) (d). Additionally, T. B. R.'s best interest would not be served living with the mother in a home with the putative father, who had not completed his case plan and who had abused T. B. R.'s older sister. See *M. L.*, supra, 290 Ga. App. at 440-441 (2). Moreover, although DFCS had not yet identified an adoptive home for T. B. R., "termination of the [parents'] rights would make [him] eligible for adoption, giving [him] a realistic possibility of having a secure, stable home." (Punctuation omitted.) *In the Interest of J. D.*[16] Accordingly, the juvenile court did not abuse its discretion in finding that termination of the mother's parental rights served the best interest of T. B. R.

2. The mother contends that the juvenile court erred in failing to require DFCS to make a thorough and exhaustive search for suitable family placement for T. B. R. pursuant to OCGA § 15-11-103 (a) (1). This contention is without merit.

"[I]n 2003, the General Assembly deleted the requirement that 'a thorough search for a suitable family member shall be made by the court and the Department of Human Resources,' in connection with a juvenile court's obligation to first attempt to place a child with relatives." *In the Interest of L. L.*[17] See Ga. L. 2003, p. 503, § 1. The current Code section regarding placement with relatives after a

---

[14] *In the Interest of D. P.*, 287 Ga. App. 168, 174 (2) (651 SE2d 110) (2007).

[15] *In the Interest of M. W.*, 275 Ga. App. 849, 854 (3) (622 SE2d 68) (2005).

[16] *In the Interest of J. D.*, 292 Ga. App. 64, 68 (1) (c) (663 SE2d 785) (2008).

[17] *In the Interest of L. L.*, 280 Ga. App. 804, 806 (2) (635 SE2d 216) (2006).

parent's rights are terminated provides:

> If, upon the entering of an order terminating the parental rights of a parent, there is no parent having parental rights, the court shall first attempt to place the child with a person related to the child by blood or marriage or with a member of the child's extended family if such a person is willing and, after study by the probation officer or other person or agency designated by the court, is found by the court to be qualified to receive and care for the child, if the court determines such placement is the most appropriate for and in the best interest of the child. A placement effected under this paragraph shall be conditioned upon the family member who is given permanent custody or who is granted an adoption of the child agreeing to abide by the terms and conditions of the order of the court.

OCGA § 15-11-103 (a) (1). To the extent the mother is asserting that the juvenile court failed to comply with its obligation to make an attempt to place her child with relatives as outlined above, we also find no error.

"This Court will not disturb a juvenile court's determination that placement with a relative is not in the best interest of the child absent an abuse of discretion. . . ." *B. W.,* supra, 287 Ga. App. at 65 (4). Furthermore, "[w]here some evidence exists showing compliance with the dictates of [OCGA § 15-11-103], there is no basis for reversal." *In the Interest of S. V.*[18] Here, the record shows that DFCS made efforts to place T. B. R. with his maternal grandmother but ultimately determined that such a placement was not suitable. At the termination hearing, an investigator who conducted a placement evaluation of the maternal grandmother's home testified that she was not approved because the grandmother's husband has significant medical problems, which required constant care by the grandmother. Additionally, both the grandmother and her husband suffered from depression, and there was a history of domestic arguments between T. B. R.'s mother and the grandmother's husband. The maternal grandmother also testified at the termination hearing and confirmed that at the time T. B. R. was initially placed into foster care, she was unable to take him into her home because she was suffering from pneumonia and her husband had recently suffered a stroke, which required her to provide constant care for him. In fact, the grandmother admitted that although she did not

---

[18] *In the Interest of S. V.,* 281 Ga. App. 331, 332 (1) (636 SE2d 80) (2006).

want to lose contact with T. B. R., she could not care for him and her husband at the same time. No other relatives were mentioned in the record as possible placements for T. B. R. Accordingly, the juvenile court did not abuse its discretion by failing to require DFCS to place T. B. R. with a relative. See *B. W.*, supra, 287 Ga. App. at 65 (4); *L. L.*, supra, 280 Ga. App. at 807 (2).

3. The mother also contends that the juvenile court erred in failing to require DFCS to pursue alternatives to terminating her parental rights. However, the record belies this argument. After DFCS took custody of T. B. R., it established a case plan for the mother with reunification as its goal. In fact, DFCS only decided to petition for termination after two years had passed without the mother fully complying with critical parts of her case plan. Furthermore, as noted above, DFCS evaluated the maternal grandmother's home for possible placement of T. B. R. but ultimately determined that such a placement was not appropriate. Accordingly, the mother's contention that DFCS failed to pursue alternatives to termination is without merit. See *In the Interest of A. M.*[19]

### Case No. A10A1445

In his first three enumerations of error, the father contends that the evidence was insufficient to support the termination of his parental rights as to T. B. R. and also argues that the juvenile court erred in denying his motion for a continuance of the termination hearing in order to allow his newly-appointed counsel to prepare. These contentions are without merit.

Despite being served with notice that DFCS had petitioned to terminate his parental rights, as well as with notice of the termination hearing, the father did not attend the first day of the hearing. On the second day, the father appeared but was not represented by counsel. Consequently, the juvenile court appointed counsel to represent the father and continued the matter for several days so that the father's counsel would have time to prepare. When the termination hearing resumed, the father's newly-appointed counsel moved for another continuance, arguing that he needed still more time to prepare. The court responded that it would allow the father's counsel to recall witnesses that he was not currently prepared to examine at a later point in the hearing but that it would not continue the matter again.

4. The father now contends that the juvenile court erred in denying his motion for a continuance and in finding that sufficient evidence supported termination of his parental rights. However, it is

---

[19] *In the Interest of A. M.*, 275 Ga. App. 630, 635 (6) (621 SE2d 567) (2005).

undisputed that the father failed to legitimate T. B. R. despite being ordered by the court to do so at an earlier hearing and despite being served with notice by DFCS that his parental rights would be terminated if he did not legitimate the child. OCGA § 15-11-96 (i) (1) provides:

> A biological father who is not the legal father loses all rights to the child and the court shall enter an order terminating all such father's rights to the child and such father may not thereafter object to the termination of his rights to the child if within 30 days from his receipt of the notice [of the termination proceeding] he . . . [d]oes not file a legitimation petition and give notice as required in sub-section (h) of this Code section.

As previously noted, in this matter, the father has not even attempted to legitimate. "Thus, because the father failed to legitimate [T. B. R.], he lacked standing to challenge the termination of his parental rights." (Punctuation omitted.) *In the Interest of J. S.*[20] See *In the Interest of C. G.*;[21] *In the Interest of L. S. T.*[22] Given his lack of standing, the father's argument that the juvenile court erred in denying his motion for a continuance is moot. See *J. S.*, supra, 302 Ga. App. at 345 (2).

5. The father also contends that the juvenile court erred in failing to have him produced from prison for various status review hearings, in which it was determined that T. B. R. was deprived. However, in light of our holding in Division 4, this contention is moot. See *J. S.*, supra, 302 Ga. App. at 345 (2).

*Judgments affirmed. Barnes, P. J., and Bernes, J., concur.*

DECIDED JULY 5, 2010.

*Victoria E. Rowan*, for appellant (case no. A10A1444).
*Jana L. Evans*, for appellant (case no. A10A1445).
*Thurbert E. Baker, Attorney General, Shalen S. Nelson, Senior Assistant Attorney General, Andrea R. Moldovan, Elizabeth M. Williamson, Penny Hannah, Assistant Attorneys General*, for appellee.

---

[20] *In the Interest of J. S.*, 302 Ga. App. 342, 345 (2) (691 SE2d 250) (2010).
[21] *In the Interest of C. G.*, 289 Ga. App. 844, 855 (3) (658 SE2d 448) (2008).
[22] *In the Interest of L. S. T.*, 286 Ga. App. 638, 639 (2) (649 SE2d 841) (2007).