727 S.E.2d 163 (2012)
315 Ga. App. 607
In the Interest of C.L. et al., children.
No. A11A2423.
Court of Appeals of Georgia.
March 30, 2012.
*164 James Kenneth Luttrell, Woodstock, Samuel S. Olens, Atlanta, Hope Merkert Pereira, Shalen S. Nelson, Jamie Lisa Smith, Marietta, Elizabeth M. Williamson, for Interest of C.L. et al., children.
BLACKWELL, Judge.
The mother of two young boys, C.L. and C.L.,[1] appeals from the termination of her parental rights.[2] She contends, among other things, that the evidence is insufficient to sustain two of the factual findings on which the termination was premised. We find no merit in this contention, and we affirm.
Viewed in the light most favorable to the judgment below,[3] the evidence shows that the older boy came to the attention of the Department of Family and Children Services in April 2008, when the Department learned that his parents had a problem with substance abuse. Nearly a year later, the mother was arrested on drug charges, and at that time, the older boy was taken into the custody of the Department. Although the older boy was returned in March 2009 to the custody of his mother under a protective order, he was taken again into the custody of the Department only a month later, when both of his parents were arrested after they failed drug tests. At that time, both parents consented to a finding of deprivation based upon their incarcerations, unstable housing, unemployment, and unresolved substance abuse issues, and the juvenile court entered an order consistent with that stipulation.
*165 The younger boy was born in October 2009. Two months later, and only about a week before the older boy was scheduled to be returned to his mother, she was arrested again, having violated the terms of her probation by breaking her curfew and failing a drug test. At that point, the younger boy also was put in the custody of the Department, and both parents again consented to findings of deprivation, this time with respect to the younger boy.
In January 2010, the mother was released from jail, and she entered an inpatient rehabilitation program to get help with her drug problem. She left that program without permission, however, only three months later. In March and April 2010, the mother refused to take a drug test on three occasions, and when a judge ordered her to take a drug test soon thereafter, she tested positive for methamphetamine use. The mother later admitted that, if she had taken the other drug tests in March and April 2010, she probably would have failed them too.
In May 2010, the juvenile court approved a permanency plan of reunification and a concurrent permanency plan of non-reunification, termination of parental rights, and adoption. These plans required the mother to obtain and maintain stable housing and employment, obtain substance abuse evaluations and any recommended treatment, submit to random drug tests, attend parenting classes, resolve any criminal cases that might affect her ability to parent, maintain meaningful contact with the children, pay child support, and cooperate with the Department. Around that time, authorities could not locate the mother for about two months, although she later testified that, during this time, she was awaiting bed space in a better rehabilitation facility. She had no contact at all with her children between April and August 2010.
In July 2010, the mother was admitted into another rehabilitation program, but she twice tested positive for methamphetamine use in the weeks following her admission to the program. Although the mother testified that she only used drugs "two or three times" after the boys were born, she conceded that, between April and July 2010, she spent her time "getting high," and she used drugs at least once after entering the second rehabilitation program. The mother stayed in the second rehabilitation program for about 30 days, and in August 2010, she surrendered to law enforcement authorities on yet another probation violation. The mother still was incarcerated when the court below heard evidence on the petition to terminate her parental rights in December 2010.[4]
The two boys were placed in the same foster home when they were taken into the custody of the Department, and they have remained there since. At the hearing, their caseworker testified that the boys now are doing "very well," and their foster parents want to adopt them. The caseworker said that the foster home is the only home that the younger boy could remember, and she was unsure whether he would even know his mother. The caseworker testified that the older boy also is doing well in the foster home, although she conceded that he has a bond with his mother. The caseworker explained, however, that, because the mother had been unable to be a parent to the boys, they have nothing to gain by continuing a relationship with her. Both the guardian ad litem and the court-appointed special advocate (CASA) recommended that the juvenile court terminate the parental rights of the mother. The guardian cited the criminal history of the mother, her lack of history of stable employment, her unresolved drug issues, and her failure to take responsibility for her actions, as well as the need of the boys for permanency. The CASA agreed, explaining that, since leaving the custody of their mother, the boys "are receiving education, they're loved, everything."
In its termination order, the juvenile court found that the mother failed to make significant progress toward reunification in the two years in which she had been offered services. The court concluded that, given her history and continuing incarceration, the mother was unlikely to remedy the causes of deprivation *166 within a reasonable time. With respect to the physical, emotional, and mental health needs of the boys, the court found that "the children do have the need for a sense of permanency and a safe and stable home." The court noted that the older boy had been in the custody of the Department for the last two of his four years of life, and the younger boy had been in the Department's care for all but the first two months of his life. The court further found that the boys had been placed together in a stable and loving foster home and that their foster parents had expressed a "willing[ness] to provide [them] with a permanent home through adoption."
The mother filed a timely motion for new trial. At the hearing on this motion, she apparently submitted evidence that she was scheduled to be released from her current term of incarceration in May 2011. The court denied the motion, and she filed a timely discretionary appeal, which this Court granted.
1. When we consider the sufficiency of the evidence adduced in support of a petition to terminate parental rights, we ask whether any rational trier of fact could have found clearly and convincingly that the rights of the natural parent to custody have been lost. In the Interest of R.S., 287 Ga.App. 228, 228, 651 S.E.2d 156 (2007) (punctuation omitted). To prove that parental rights ought to be terminated, the Department first must prove "parental misconduct or inability" by clear and convincing evidence. OCGA § 15-11-94(a). Such proof requires the Department to establish: (1) that the child is deprived; (2) that the deprivation is a result of a lack of proper parental care or control; (3) that the cause of the deprivation is likely to continue; and (4) that continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child. See OCGA § 15-11-94(b)(4)(A)(i)-(iv). If the Department carries this burden, it then must prove that "termination of parental rights is in the best interest of the child, after considering the physical, mental, emotional, and moral condition and needs of the child[,] including the need for a secure and stable home." OCGA § 15-11-94(a). In this case, the mother does not challenge the findings that the boys are deprived or that a lack of proper parental care or control is the cause of the deprivation.[5] Nor does she claim that the court erred when it found that termination was in the best interest of the boys. Instead, the mother argues only that the Department failed to prove that the deprivation is likely to continue and that any such continued deprivation is likely to cause serious harm to the boys. We address each of these contentions below.
(a) With respect to a finding that deprivation is likely to continue, we have explained before that:
[i]f over the intervening months or years since she originally lost custody of the children, the mother has not modified the behavior that led to the original and continued removal of the children, then a court could find that the mother will continue to so act in the future and therefore that the cause of the deprivation will likely continue.
In the Interest of T.A.H., 310 Ga.App. 93, 96(2), 712 S.E.2d 115 (2011) (footnote omitted). "[T]he court can consider a parent's past conduct in determining whether ... conditions of deprivation are likely to continue." In the Interest of B.T., 291 Ga.App. 604, 608(c), 662 S.E.2d 656 (2008) (citation and punctuation omitted). And although a "parent's incarceration does not always compel the termination of parental rights, it can support a termination when there are sufficient aggravating circumstances present." In the Interest of A.E.S., 310 Ga.App. 667, 669-670, 714 S.E.2d 148 (2011) (footnote omitted.). A juvenile court also is entitled to consider proof that a parent failed to complete a case plan as evidence that a deprivation is likely to continue, In the Interest of J.A., 298 Ga.App. 11, 15(1), 679 S.E.2d 52 (2009).
Here, the evidence shows that the mother was arrested and jailed following the birth of the older boy. She then violated her probation *167 on at least two occasions, leading to two additional periods of incarceration, which left her unable to provide a stable environment for the boys or to support them. Even if she left the first rehabilitation program for legitimate reasons, she left it without permission, relapsed into drug abuse, and failed to notify the Department of her whereabouts. This evidence is sufficient to support the finding that the deprivation is likely to continue. See In the Interest of K.A.S., 279 Ga.App. 643, 650-651(1)(b), (c), 632 S.E.2d 433 (2006) (evidence including that mother "failed to complete two of the most important goals of her case plan, to obtain and maintain a stable, legal income and housing," was sufficient to show that the deprivation was due to lack of parental care and control and that the causes of the deprivation were likely to continue); In the Interest of M.N.R., 282 Ga. App. 46, 47-48, 637 S.E.2d 777 (2006) (even assuming that a mother had stopped using drugs by the time of the termination hearing, evidence including her admission that she had not completed a drug treatment program she enrolled in six months before the hearing and had relapsed after completing an earlier program was sufficient to affirm the juvenile court's judgment that the deprivation was likely to continue).
(b) We next consider whether evidence supports the finding that the continued deprivation of the boys is likely to cause them serious harm. When a court assesses whether a child now in foster care is likely to suffer serious ham as a result of continued deprivation, see OCGA § 15-11-94(b)(4)(A)(iv), the court must consider not only the likelihood of harm if the child remains indefinitely in foster care, but also the likelihood of harm if the child returns to the custody of his parent, notwithstanding that the deprivation persists.[6]In the Interest of J.E., 309 Ga.App. 51, 58(1)(d), 711 S.E.2d 5 (2011) (whole court) ("[O]ur law requires a juvenile court to consider not only the relationship between the parent and child at the time of the termination hearing, bid also what might happen if the child were returned to the parent given the likelihood that the deprivation under which the child has been suffering would continue after a reunion with that parent."). Here, the evidence shows a likelihood of harm in both circumstances.
First, the record supports a finding that the boys likely would suffer serious harm if they were returned to their mother. After all, the deprivation in this case involves, among other things, the mother repeatedly relapsing into abuse of illegal drugs, as well as her repeated incarceration for crimes and violations of probation, circumstances that, the court below found, are likely to persist. When the record includes evidence sufficient to support a finding that such circumstances are likely to persist and thereby leave a parent unable to provide for the needs of her child, we have said, time and again, that the same evidence also may authorize a finding that continued deprivation is likely to cause serious harm, even if it does not compel a finding of likely harm. See, e.g.. In the Interest of A.E., 314 Ga.App. 206(2)(c), 723 S.E.2d 499 (2012); In the Interest of T.B.R., 304 Ga.App. 773, 782(1)(d), 697 S.E.2d 878 (2010); In the Interest of K.A.S., 279 Ga.App. at 651-652(1)(d), 632 S.E.2d 433. In J.E., we sustained a finding of a likelihood of harm based on evidence similar to the evidence that appears in this case. 309 Ga.App. at 58(1)(d), 711 S.E.2d 5 (considering "the harmful consequences of the mother's possible or likely relapse into drug use and/or her continued failure to provide for her child").
As to the likelihood of harm as a result of foster care continuing indefinitely, the court below found that "the children do have the need for a sense of permanency and a safe and stable home."[7] This finding is no error. In the first place, our Court has recognized, in case after case, that children should not be required to linger unnecessarily and indefinitely in foster care, inasmuch as "children need permanence of home and emotional stability, *168 or they are likely to suffer serious emotional problems." J.E., 309 Ga.App. at 58(1)(d), 711 S.E.2d 5 (punctuation and citation omitted); see also In the Interest of T.H., 311 Ga.App. 641, 645, 716 S.E.2d 724 (2011); In the Interest of R.J.D.B., 305 Ga. App. 888, 895(1)(b), 700 S.E.2d 898 (2010); In the Interest of A.R., 302 Ga.App. 702, 711(1)(d), 691 S.E.2d 402 (2010); In the Interest of A.J.D.S., 300 Ga.App. 235, 239(4), 684 S.E.2d 360 (2009); In the Interest of S.N.H., 300 Ga.App. 321, 327(1)(d), 685 S.E.2d 290 (2009); In the Interest of K.R., 298 Ga.App. 436, 442(1)(d), 680 S.E.2d 532 (2009); In the Interest of P.D.W., 296 Ga. App. 189, 196(1)(d), 674 S.E.2d 338 (2009); In the Interest of D.W., 294 Ga.App. 89, 93(1)(d), 668 S.E.2d 533 (2008); In the Interest of C.J.L.C., 293 Ga.App. 848, 852(2)(c), 668 S.E.2d 821 (2008); In the Interest of J.L.C., 292 Ga.App. 763, 768, 666 S.E.2d 98 (2008); In the Interest of D.B.C., 292 Ga.App. 487, 496(1)(d), 664 S.E.2d 848 (2008); In the Interest of J.S., 292 Ga.App. 86, 89, 663 S.E.2d 793 (2008). Given our consistent recognition of this principle, we are not convinced that affirmative and individualized evidence always is required to authorize a finding that a child has a need for permanence and stability. But even if it is required, such evidence appears in this case. The case manager testified that both boys need permanency. About the younger boy, the case manager noted that he had been in the custody of the Department since he was seven weeks old, that his foster parents loved and cared for him and satisfied his needs, and that "[h]e needs to know that that's going to continue." As to the older boy, the case manager testified that he has been "through so much already" and "needs the stability that he has" with his foster parents. And the guardian ad litem described the need of the older boy for permanence as "dire." Finally, the case manager testified that, although the mother loved the boys, she provided no stability, and the boys had nothing to gain from a continued relationship with her; the CASA reported that the mother had no stable housing or employment, that inconsistent visits with the mother negatively affected the older boy, and that the needs of both boys were met by their foster parents; and the guardian ad litem urged that the juvenile court terminate the parental rights of the mother to "permit these children to attain permanency." This evidence is sufficient to sustain a finding that a continuation of foster care is likely to cause serious harm to the boys. See, e.g., In the Interest of M.S.S., 308 Ga.App. 614, 618, 623(2)(b), 708 S.E.2d 570 (2011) (physical precedent only) (CASA testified about child's need "for permanency and stability"); In the Interest of J.S.T.S., 273 Ga.App. 221, 226, 614 S.E.2d 863 (2005) (guardian ad litem testified about the "stability the children needed").
2. The mother also asserts two other claims of error, but both are without merit, and neither warrants much discussion. First, the mother complains about the failure of the court below to continue the hearing on the petition to terminate her parental rights to permit her to obtain the testimony of an employee of one of the rehabilitation programs in which she was enrolled. But it appears that this testimony would have been cumulative of other evidence presented at the hearing, and for this reason, the denial of the continuance was no error. See In the Interest of N.S.M., 183 Ga.App. 398, 399(2), 359 S.E.2d 185 (1987) (no error in excluding cumulative evidence). Second, the mother contends that the juvenile court should have placed the boys with the paternal grandmother of their half-sister. "This Court will not disturb a juvenile court's determination that placement with a relative is not in the best interest of the child absent an abuse of discretion," In the Interest of T.B.R., 304 Ga.App. at 784(2), 697 S.E.2d 878 (citations and punctuation omitted), and although the court below considered this placement, it concluded that the grandmother, who has limited means and is caring for four other children, was without sufficient resources to care sufficiently for the boys. That conclusion was no abuse of discretion.
Judgment affirmed.
ELLINGTON, C.J., BARNES, P.J., DOYLE, P.J., and MILLER, J., concur.
MIKELL, P.J. and ADAMS, J. dissent.
*169 ADAMS, Judge, dissenting.
Although I concur fully in Divisions 1(a) and Division 2, I respectfully dissent from Division 1(b) of the majority's opinion affirming the termination of the mother's parental rights because I believe that DFCS failed to present clear and convincing evidence that the continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the children.
While, as the majority notes, we are required to view the evidence below in the light most favorable to the judgment, that standard does not require that we ignore a parent's efforts to comply with DFCS requirements. The majority's factual recitation omits almost all of the evidence showing the mother's efforts to address her drug problem and comply with the case plans and her probation. I believe that such facts are pertinent and, indeed, must be considered for a determination of whether a continued relationship with the mother is likely to cause harm to the children.
The evidence showed that the mother complied with her case plan for a period of almost five months until she relapsed shortly before she was scheduled to regain custody of the older son in December 2009. And upon the mother's release from jail in January 2010, she asked to enter an inpatient rehabilitation program to help with her drug issues, rather than be released to deal with this problem on her own. The evidence showed, however, that the choice of program actually undercut her efforts at self-improvement. Although the mother eventually left that program without permission, she testified that she left because one of the counselors sexually assaulted her and drug use was prevalent, which led to her using drugs there. No evidence was introduced to contradict the mother's version of these events. The mother said that she did not report these incidents because she did not think that anyone would believe her and that she would be kicked out of the program; the counselor who assaulted her told her that she needed to get on his "good side" because he was the one who talked to her probation officer and he could make sure she went back to jail.
The mother, in fact, had clean drug screens starting in January 2010 although she refused three drug screens in March and April and tested positive for methamphetamine on April 21, 2010 after the judge ordered her to have a hair screen. She dropped out of contact with the court and DFCS at this point because she did not want to go back to that rehabilitation center and she was "scared." The evidence showed, however, that prior to her positive drug screen, the mother continued to visit her children every week between January and April 2010. She brought the children clothes, shoes or some kind of gifts at these visits. During this same time, from January to April, 2010, she worked cleaning houses.
From the end of April to June 2010, the mother's whereabouts were unknown to authorities,[1] but she testified that during this time, she was awaiting bed space in a better rehabilitation facility. After leaving the first rehabilitation center, she applied to Mothers Making a Change, had her intake interview in June and entered the facility on July 14, 2010. The mother admitted that she went into the facility "dirty," but said that she only used drugs once more, one week after starting the program. Afterward, she was placed on a 45-day plan and was doing well. While at that rehabilitation center, the mother attended classes like Early Recovery, Relapse, Prevention and Parenting. She also attended Alcoholics Anonymous several times per week during this time. She stayed there about 30 days before she left to turn herself in to the Cherokee County Adult Detention Center on or about August 22, 2010. She left Mothers Making A Change voluntarily to turn herself in; she was not ousted from the program and thus she understood that she could return. Although she was out of that rehabilitation center for several days before turning herself in, she said she was not using drugs during this period. And the mother testified that when she was released from probation, she intended to re-enter Mothers Making a Change, which had facilities giving *170 her the potential to have the children while she was working on her rehabilitation plan.
Even if the trial court could have found that the deprivation was likely to continue, the record lacks clear and convincing evidence to support the court's finding that the continued deprivation is likely to cause the requisite harm. "Unlike other cases where we have found evidence of such harm, no caseworker here testified as to any adverse effect on the children by their remaining in foster care as opposed to their being permanently adopted." (Citations omitted.) In the Interest of A.T., 271 Ga.App. 470, 473, 610 S.E.2d 121 (2005). Here the only testimony from the caseworker even tangentially addressing this point was her testimony that the children had "nothing to gain" by continuing a relationship with their parents. The same caseworker also testified that the older son had a bond with his mother and that the mother clearly loved her sons. Nor was there any expert testimony addressing the issue of the need for permanency and the detrimental effects of foster care. Id. The case worker and the guardian testified that, apparently in their opinions, the children needed permanency, but neither was qualified as an expert in the needs of foster children. Although a lay witness may give an opinion, the witness must give sufficient facts to establish the basis of her opinion, Smith v. Smith, 281 Ga. 380, 382(1), 637 S.E.2d 662 (2006). Moreover, "[t]he opinion of a lay witness is not admissible when all of the facts and circumstances upon which it is based are capable of being clearly defined, so that the [factfinder] may readily reach its own opinion therefrom." (Footnote omitted.) Johnson v. Knebel, 267 Ga. 853, 855(1), 485 S.E.2d 451 (1997). Here the caseworker and the guardian gave no facts to support their opinions and DFCS made no attempt to lay out any facts upon which the trial judge could formulate its own opinion on the issue of permanency.
Instead, the caseworker's evidence was simply that the foster parents were taking good care of the children and the children were doing well in their care, thus implying, perhaps, that they would be better off if the foster parents adopted them. But that is not the test. "A court is not allowed to terminate a parent's natural right because it has determined that the child might have better financial, educational, or even moral advantages elsewhere." (Citation omitted.) Carvalho v. Lewis, 247 Ga. 94, 274 S.E.2d 471 (1981). To the contrary, DFCS was required to show that the children would be seriously harmed if the mother's parental rights were not terminated. I do not believe that simply stating that the children need permanence, without citing any evidence to show that a continued relationship with the parent will cause "serious physical, mental, emotional, or moral harm" is enough to sever all parental ties between the mother and her children. (Emphasis supplied.) Even if the majority were correct in stating that individualized evidence of the need for permanency is not required in every case, DFCS at least should be required to present individualized evidence that continuing a relationship with the parent will cause serious harm to the children in addition to some generalized understanding of a need for permanence and stability. There was absolutely no evidence that the children "are currently suffering due to their placement in foster care or that without a permanent placement that they would suffer serious harm." Id. at 474, 610 S.E.2d 121. In fact, the caseworker testified that the children were doing very well. "Rather, all we have is evidence of the mother's inability to parent her children. The mother's inability to care for her children does not necessarily mean that her current relationship with them is detrimental." (Citations and punctuation omitted.) Id. at 473, 610 S.E.2d 121. And here, the evidence demonstrated that the mother had made some headway in her attempts to resolve her drug issues and that she was motivated to continue her rehabilitation in a facility where she had previously shown progress.
Thus, I find that DFCS simply failed to present clear and convincing evidence to satisfy this statutory requirement. "The lack of testimony as to harm has repeatedly caused us to reverse the lower court's order of termination. [Cits.]" Id. As this Court has previously noted, "termination of parental rights is a remedy of last resort and can be sustained only when there is clear and convincing *171 evidence [of the statutory factors].... While [I am] reluctant to reverse the juvenile court's determination, no judicial determination is more drastic than the permanent severing of the parent-child relationship." (Punctuation and footnotes omitted.) In the Interest of D.L.T.C., 299 Ga.App. 765, 771(1), 684 S.E.2d 29 (2009). See also In the Interest of J.E., 309 Ga.App. 51, 57(1)(d), 711 S.E.2d 5 (2011) (a finding that deprivation is likely to continue does not automatically support a finding that continued deprivation will harm the child; whether the facts authorizing the former finding also authorize the latter finding depends on the circumstances of the case).
Accordingly, I would reverse the trial court's order terminating the mother's parental rights.
I am authorized to state that Presiding Judge Mikell joins in this dissent.
NOTES
[1] For the sake of clarity, we refer to the boys in this opinion as the "older boy" and the "younger boy." The older boy was born in January 2007, and the younger boy was born in October 2009.
[2] The parental rights of the father also were terminated, but that is not an issue in this appeal.
[3] See In the Interest of M.S.S., 308 Ga.App. 614, 708 S.E.2d 570 (2011).
[4] At the hearing, the mother estimated that she would remain incarcerated until the middle of 2011, and after that, she would serve another seven years on probation, during which time she presumably would be subject to random drug tests.
[5] In any event, we note that the mother's incarceration at the time of the termination hearing and her resulting inability to support the boys authorized the court to make those findings. See In the Interest of D.T.A., 312 Ga.App. 26, 31(1)(a), (b), 717 S.E.2d 536 (2011).
[6] The dissent addresses only the former of these considerations. Because the dissent does not consider the likelihood of harm if the boys return to the custody of the mother, notwithstanding that the deprivation persists, its analysis is incomplete.
[7] The record contains evidence that the boys' foster parents, who have cared for them for most of their lives, are interested in adopting the boys.
[1] Although the mother appeared briefly at one court hearing in June 2009, she left because she was told she had an outstanding warrant and would probably go to Jail.