**FIRST DIVISION**
**BARNES, P. J.,**
**ELLINGTON, P.J., and MCMILLIAN, J.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**June 22, 2018**

# In the Court of Appeals of Georgia

A18A0416. IN THE INTEREST OF A. F. et al., CHILDREN.

BARNES, Presiding Judge.

The mother of A. L. C. B. F. ("A. F."), C. M. J. F. ("C. F."), and A. K. W. F., appeals from the order of the trial court terminating her parental rights.[1] On appeal, she contends that the evidence was insufficient to support the termination. Upon our review, and finding insufficient evidence demonstrating that continued dependency will cause or is likely to cause the children serious physical, mental, emotional, or moral harm, we reverse.

> On appeal from an order terminating parental rights, we review the evidence in the light most favorable to the juvenile court's judgment in order to determine whether any rational trier of fact could have found by clear and convincing evidence that the natural parent's rights to custody have been lost. We neither weigh evidence nor determine witness credibility, but defer to the juvenile court's findings of fact and affirm unless the appellate standard is not met.

---

[1] This Court granted the mother's application for discretionary review of the termination order.

(Citation and punctuation omitted). *In re U. G.*, 291 Ga. App. 404, 404 (662 SE2d 190) (2008).

So viewed, the evidence demonstrates that, at the time of the termination hearing, A. L. C. B. F. was four-and-a-half years old; C. M. J. F. was three-and-a-half years old, and A. K. W. F. was one-and-a-half years old.[2] Andrew Walker is the biological father of A. K. W. F.[3] The location of A. L. C. B. F. and C. M. J. F.'s putative biological father is unknown, and the legal father, the mother's husband, by request, was excused from the proceedings.

On June 9, 2015, upon the filing of a complaint alleging dependency, and the entry of a dependency removal order, A. L. C. B. F. and C. M. J. F. were taken into the custody of the Whitfield County Division of Family and Children Services ("DFCS") On June 10, 2015, the trial court entered a preliminary protective order placing temporary custody of the two children with DFACS. According to the order, there was probable cause to believe that the children were dependant because the

---

[2] The mother has a fourth child, her oldest, who is also in state custody and who is not a part of this case.

[3] The juvenile court terminated both the mother's and Walker's parental rights in the termination order, but only the mother's termination is the subject of this appeal.

mother was unemployed, did not have a stable environment for the children, and there was a history of domestic violence, including a recent physical altercation between the mother and her current boyfriend during which she had threatened to "harm herself with a razor." Thereafter, on June 15, 2015, DFACS filed a petition of dependency alleging that the two children were dependent because the "children have been abused or neglected and are in need of protection of the court" given the mother's unemployment, lack of stable home environment and violent relationship with Walker, the father of her unborn child.

Subsequently, the juvenile court entered an order of dependency as to the two children. According to that order, the children were dependant "due to being homeless, and without food, clothing and shelter." The order noted the mother's frequent moves and that she had been staying week-to-week in different motels; at one point, there was no food in her residence; and she was seen searching through trash cans for food at a gas station. The order also noted the mother's history of abusive relationships with men and the children witnessing the abuse.

The mother's ensuing reunification case plan required, among other things, that she maintain stable housing for six consecutive months, maintain visitation with the children, pay child support, participate in parenting classes, comply with random drug

3

screenings, and comply with psychological referral for parental fitness and domestic violence assessments. After a case plan judicial review and permanency planning hearing, on September 9, 2015 the trial court entered an order detailing the mother's progress, including that, although she was still unemployed, she was visiting the children, had enrolled in parenting classes, and had all negative drug screenings. At the time, the mother was living with Walker at his grandmother's house.

After a March 2, 2016 permanency hearing, the trial court found that the mother had completed her psychological evaluation and continued to have clean drug screenings. She was also working, had housing and was paying child support. A. K. W. F., who was born on November 30, 2015, was living with the mother, and the mother was allowed limited, but unsupervised visitation with A. F. and C. F. However, the trial court found that before the children could be reunited with the mother, additional elements of the case plan needed to be completed, including mental health treatment.

On March 30, 2016, the mother visited DFACS and reported that the previous night, she and Walker had an altercation and she was "fearful for her safety." She said that Walker "hit her frequently," and was advised to get a Temporary Protective Order ("TPO") to have Walker removed from the lease. DFACS scheduled an

4

appointment for the mother to meet with the District Attorney's office to take out the TPO, but she did not show up. However, Walker was arrested and charged with family violence, and his probation was revoked. On May 25, 2016, after Walker was released from jail and discovered hiding in the mother's home, A. K. W. F. was taken into DFACS custody.

The trial court's order after a subsequent August 8, 2016 permanency hearing revealed that, although the mother had achieved certain of her case plan goals, her housing was uncertain because she lived in a mobile home that was leased to Walker. The trial court "strongly cautioned" the mother about continued contact with Walker because of their "domestic violence issues." The mother had been referred for mental health treatments, and had participated in vocational rehabilitation and applied for Social Security disability.

On January 9, 2017, DFCS filed a petition to terminate the mother's parental rights, alleging that termination was in the children's best interest because she: could not maintain stable housing, employment, or transportation; had a history of abusive relationships and did not protect the children from the effects of the abuse; and was intellectually and emotionally incapable of safely parenting the children.

Hearings on the termination petition was held on April 10, 2017 and April 20, 2017. A case manager with DFACS testified that the mother had a long history of instability with housing, income and relationships, and that her involvement with DFACS started in February 2013. At that time, DFACS received a report that the mother was living with A. F. in an abandoned house in Columbus, Georgia, and a family support case was opened the next month because the mother was homeless. DFACS received a report in August 2013 that the family was homeless and that the mother was observed striking one of her children while in a hospital emergency room. In February and March 2014, DFACS investigated reports of neglect and family violence, and the case was ultimately closed when the family moved in with the mother's mother-in-law.

The case manager further testified that the current case was a result of allegations of neglect and family violence, including that the mother had reported that Walker struck her in the head and stomach while she was pregnant with A. K. W, F. According to the case manager, at the time of the termination hearing, the mother did not have a stable income, refused to participate in therapy, and continued her relationship with Walker, which endangered the children. She also testified that the mother would not work with Georgia Vocational Rehabilitation Services ("GVRS"),

6

had let her food stamps and other benefits lapse, and that the children would not be safe in her care.

A job readiness specialist with GVRS testified that the mother had briefly worked at a convenience store, but at the 90-day follow-up, the mother was no longer working. A parent aide with Family Menders testified that while the mother was cooperating with services, she missed at least 15 appointments and had at least 3 different residences. The aide testified that the mother had little or no food in the home on several occasions, that she had bought food for the mother with her own money, and that the mother had difficulty preparing even basic meals. According to the aide, from the time she started working with the mother in July 13, 2016 until the time of the hearing, the mother had only worked "maybe six to eight weeks."

A friend of the mother's testified that she would provide food for the mother at times, that the mother had asked her not to tell DFCS that she was with Walker, and that although the mother loves the children, she cannot take care of them, financially or otherwise. The mother's oldest child, and A. K. W. F. are placed with the friend, and, she agreed that the children "have a good time seeing their mother," and that they love her and know that she's their mother.

A psychologist, who had seen the mother on three different occasions, testified that she did not believe that the mother could independently meet the needs of caring for the children or provide an environment in which to raise them. According to the doctor's evaluation, the mother likely needed daily parenting support, and the doctor diagnosed her with mixed personality disorder, borderline intellectual functioning, and intellectual developmental disorder.

The mother testified that she currently had rent-free housing, acknowledged that she was unemployed, but was trying to apply for Social Security disability benefits. According to the mother, she was last employed a week before the termination hearing but was fired within 30 minutes because she did not speak Spanish. Five months earlier, she was fired from a gas station because she "burnt the chicken." When asked if she could keep a job, the mother answered "I can try." She further testified that she had never missed visits with the children, that the children love her and she has a strong maternal bond with them, that she had paid her child support, had completed parenting classes and psychological evaluation, and that the only goal in her case plan that she had not completed was therapy. The mother admitted that she let Walker come home when he got out of jail, and that she knew

he was not allowed to be around the children. The guardian ad litem recommended that the mother's parental rights be terminated.

The juvenile court issued an order terminating the mother and Walker's parental rights. The court concluded that there was clear and convincing evidence of parental misconduct and inability, and that termination of parental rights was in the children's best interests considering their physical, mental, emotional, and moral needs, including their need for permanency, stability, and a secure and stable home. The court found, by clear and convincing evidence, that: the children were dependent; the lack of proper parental care and control was the cause of the dependency; that cause was likely to continue and not be remedied; and the continued dependency would cause or was likely to cause serious physical, mental, emotional, or moral harm. The court also found that reasonable efforts had been made, without success, to prevent the need to remove the children from the home and to make it possible for them to return to the home, and that the termination of parental rights would enable the children to achieve a more stable home life through adoption.

In its order, the trial court included extensive factual findings including that, the mother could not consistently provide a home and care for her children, the mother's lengthy history of financial and housing instability, her history of

9

relationships involving domestic violence with at least three men, admission that she intended to reconcile with Walker, and five-year history with DFCS for these issues. The trial court acknowledged that the mother had completed parenting classes, was in counseling, and made some attempt to meet the requirements of her reunification case plan, but that her progress was insufficient, and would never be sufficient, to enable her to be a full-time independent parent.

On appeal, the mother contends that the evidence was insufficient to support the termination of her parental rights. She asserts that the evidence demonstrated substantial compliance with her case plan, including that, she completed parenting classes and drug screening, was in counseling at the time of the termination hearing, paid child support, and was significantly employed in 2016.

The termination of parental rights involves a two-pronged analysis. See OCGA § 15- 11-310. First, under OCGA § 15-11-310 (a), the trial court first determines whether one of the requisite statutory grounds for termination of parental rights has been met, including, the ground in this case, that:

> [the] child is a dependent child due to lack of proper parental care or control by his or her parent, reasonable efforts to remedy the circumstances have been unsuccessful or were not required, such cause of dependency is likely to continue or will not likely be remedied, and

the continued dependency will cause or is likely to cause serious physical, mental, emotional, or moral harm to such child.

OCGA § 15-11-310 (a) (5). Second, if any of the statutory criteria has been met, the trial court must ascertain whether termination of parental rights is in the best interest of the child. The factors pertaining to the "best interest" inquiry include: (1) the child's sense of attachments, including the sense of security and familiarity and the continuity of affection; (2) the child's wishes and long-term goals; (3) the child's need for permanence, stability and continuity of relationships; and (4) other factors listed in OCGA § 15-11-26, which the trial court considers relevant. See OCGA § 15-11-310 (b).

As to the statutory grounds, first, the mother did not appeal the juvenile court's order finding that the children were dependent, and thus she is bound by that order. *In the Interest of B. M.*, 298 Ga. App. 100, 102 (1) (a) (679 SE2d 113) (2009). In considering whether the cause of the dependency is likely to continue, among other matters, here the trial court considered evidence that, after more than two years under the existing case plan, the mother was still not ready to resume independently caring for the children. *In the Interest of O. M. J.*, 297 Ga. App. 20, 27 (2) (b) (676 SE2d 421) (2009) ("The test in determining termination of parental rights is whether the

11

mother, ultimately standing alone, is capable of mastering and utilizing the necessary skills to meet her parenting obligations.") (citation and punctuation omitted; emphasis in original). Moreover, although the mother contends that she achieved several of the case plans goals, including recent housing, the mother's housing was dependent on her relationship with others, including an abusive boyfriend, and most recently, whether her Social Security benefits were approved. The trial court was authorized to find that her housing was not stable. See *In the Interest of A. R.*, 302 Ga. App. 702, 709 (1) (c) (691 SE2d 402) (2010). Regarding "recent improvement, the trial court, not the appellate court, determines whether a parent's conduct warrants hope of rehabilitation." (Citations and punctuation omitted.) *In the Interest of D. L. S.*, 271 Ga. App. 311, 314 (1) (c) (609 SE2d 666) (2005). Consequently, the trial court did not err in finding that the dependency was likely to continue and will not likely be remedied.

> When a court assesses whether a child now in foster care is likely to suffer serious harm as a result of continued deprivation, the court must consider not only the likelihood of harm if the child remains indefinitely in foster care, but also the likelihood of harm if the child returns to the custody of his parent, notwithstanding that the deprivation persists. The State is required to show that continued dependency will cause harm. Dependency will cause harm only if all of the options

12

available to DFCS short of termination — keeping the child in foster care, or returning the child to the parent — will themselves cause harm. The State must show that both would cause harm. This Court has reversed termination orders due to a lack of evidence that the children would experience serious harm if they remained in foster care, even when the State did show that the return of the child to the parent might well cause harm. In considering whether there is evidence that remaining in foster care will cause serious harm to a child, we have examined both (1) the extent to which instability and impermanency are currently causing specific harms to the child and (2) whether the parent's current relationship with the child is itself detrimental.

(Citation and punctuation omitted.) *In the Interest of B. R. J.*, 344 Ga. App. 465, 475-476 (1) (d) (810 SE2d 630) (2018). See *In the Interest of A.S.*, 339 Ga. App. 875, 881 (3) (2016) ("The State must show that both scenarios would likely cause serious harm in order for a termination of parental rights to be justified.")

Here, although the trial court found that "serious harm will occur to the children if the children are returned to the care of either parent," the trial court did not assess the extent to which instability and impermanency are currently causing specific harms to the children, and whether, as a result of the dependency, the children would be harmed by remaining in foster care indefinitely. Although the psychologist who evaluated the mother testified that the mother's abusive relationship with Walker was

13

"not healthy for the children and that's going to lead to more trauma when they are taken away again," there was no testimony at all from any witness about the effects, harmful or otherwise, of foster care on the children in relation to their dependency. There was "no . . . finding regarding how continuing the status quo would harm the children in this case." *In the Interest of B. R. J.*, 344 at 476. See *In the Interest of A. T.*, 271 Ga. App. 470, 473-475 (610 SE2d 121) (2005) (reversing termination of rights given no particularized evidence as to adverse effects of foster care or impermanency on the children in question).

While "our Court has recognized, in case after case, that children should not be required to linger unnecessarily and indefinitely in foster care, inasmuch as children need permanence of home and emotional stability, or they are likely to suffer serious emotional problems," *In the Interest of C. L.*, 315 Ga. App. 607, 612 (1) (b) (727 SE2d 163) (2012), the evidence was "insufficient to support [the trial court's] conclusion that any continued dependency experienced by these children will cause or is likely to cause them serious physical, mental, emotional, or moral harm, and we therefore reverse." *In Interest of E. M. D.*, 339 Ga. App. 189, 206 (2) (793 SE2d 489) (2016).

*Judgment reversed. Ellington, P.J., and McMillian J., concur.*

14