**FOURTH DIVISION**
**DILLARD, C. J.,**
**DOYLE, P. J., and MERCIER, J.**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**March 7, 2019**

# In the Court of Appeals of Georgia

A18A1821. HEWLETT v. HEWLETT et al.                    DO-067

DOYLE, Presiding Judge.

The biological mother of C. J. H.[1] ("the mother") appeals from an order terminating her parental rights and granting an adoption petition filed by the child's maternal grandfather ("the grandfather" and current temporary guardian) and his wife (collectively "grandparents"). The mother argues that the superior court erred because its order was not supported by clear and convincing evidence that she failed to exercise proper parental care or control due to misconduct or inability under former

---

[1] C. J. H. was born on January 3, 2009.

OCGA § 15-11-310 (a) (5).[2] Based on our review of the record before us at this time, we agree and reverse.[3]

The adoption proceeding was predicated on the termination of the mother's parental rights pursuant to former OCGA § 19-8-10 (a) (5), which authorizes adoption without a prior surrender or termination of parental rights "when the court determines by clear and convincing evidence that the . . . [biological p]arent has failed to exercise proper parental care or control due to misconduct or inability, as set out in" former OCGA § 15-11-310 (a) (3), (4), or (5), which enumerate certain grounds

---

[2] See OCGA § 19-8-10 (a) (4) (2017) (setting out the prerequisites for adoption absent a prior surrender or termination of parental rights). Although not raised by the parties, we note that a new version with substantive changes to the Juvenile Code, including OCGA §§ 19-8-10 and 15-11-310, was enacted in 2018. See Ga. L. 2018, p. 285, § 4-1; p. 474. Because the petition and judgment in this case predate the enactment of the revised Code version, we apply the prior version in effect at the time. See *Nathans v. Diamond*, 282 Ga. 804, 808-809 (2) (654 SE2d 121) (2007) ("[T]he rule is that laws that affect substantive rights may operate prospectively only. Substantive law is that law which creates rights, duties, and obligations. Procedural law is that law which prescribes the methods of enforcement of rights, duties, and obligations.") (footnote and punctuation omitted); *Johnson v. Eidson*, 235 Ga. 820, 821 (221 SE2d 813) (1976) (noting that "[a]doption is a right which did not exist at common law[, and is purely] statutory in nature").

[3] The validity of the temporary guardianship is not before this Court, and it remains in effect at this time.

for termination of parental rights.[4] Further, the court must determine whether "the adoption is in the best interests of that child, after considering the physical, mental, emotional, and moral condition and needs of the child who is the subject of the proceeding, including the need for a secure and stable home."[5]

"On appeal from an order severing parental rights based on an adoption petition, we view the evidence in the light most favorable to the trial court's findings and determine whether a rational trier of fact could have found by clear and convincing evidence that the biological parent's rights have been lost."[6] "Nevertheless, in conducting our review, we must proceed with the knowledge that there is no judicial determination which has more drastic significance than that of permanently severing a natural parent-child relationship. It must be scrutinized deliberately and exercised most cautiously."[7] "[T]he right to raise one's children is

---

[4] See *Steele v. Steele*, 346 Ga. App. 196, 197 (816 SE2d 327) (2018).

[5] OCGA § 19-8-10 (a) (5) (2017).

[6] *Smallwood v. Davis*, 292 Ga. App. 173 (1) (664 SE2d 254) (2008).

[7] (Citation and punctuation omitted.) *In the Interest of J. A. B.*, 336 Ga. App. 367, 368 (785 SE2d 43) (2016).

a fiercely guarded right in our society and law, and a right that should be infringed upon only under the most compelling circumstances."[8]

So viewed, the record shows that C. J. H. was born in 2009 with evidence of barbiturates in his system, causing the Department of Family and Children Services ("DFCS") to intervene before he left the hospital. To avoid a foster placement with an unknown family, the grandfather offered to help, and the mother agreed to allow the grandfather to become the temporary guardian of C. J. H. In the time after C. J. H.'s birth, the mother, who has been diagnosed with schizoaffective disorder, struggled with illegal drug use resulting in periodic homelessness and incarceration for a few years until entering a mental health court diversion program in 2012.

As part of that program, the mother began receiving counseling services, and she voluntarily entered a residential substance abuse program and underwent drug testing. The program director testified that the mother was a good participant, took her medications, drug tested negative, and presented no issues during her six-month stay there. Likewise, the mother's counselor testified that the mother was sanction-free in the court program, and she successfully completed it in 2014. The mother

---

[8] *In the Interest of J. C.*, 242 Ga. 737, 738 (1) (251 SE2d 299) (1978).

continues to actively participate in counseling and regularly takes her mental health medication.

The mother receives a disability benefit due to her mental health condition, and she has had stable housing since 2013. In 2014, she moved from a one-bedroom to a two-bedroom apartment to accommodate a child. The mother's property manager testified that the mother's "rent is paid monthly on time. . . . I've never had any issues with her. And from what I could see and know of her for the almost four years that she's been there, she's been a great resident."

The grandparents have raised C. J. H. at their home since his birth, and the mother has been allowed regular visitation. The mother visited frequently at first, but then experienced interruptions from 2009 to 2012 before she entered the mental-health court program. For at least the two years leading up to the final hearing in June 2017, the mother visited C. J. H. regularly, usually over the weekend. C. J. H. was diagnosed with ADHD, which is treated with medication, but otherwise he is thriving in the grandparents' custody and earns good grades in school.

In 2015, the mother filed a petition to terminate the temporary guardianship,[9] and the parties were ordered to mediation, which was not successful because the grandparents did not believe that the mother was ready to assume full responsibility to take custody of C. J. H. In 2016, the grandparents filed a petition to adopt C. J. H., and after an evidentiary hearing at which all the parties testified, the superior court entered an order terminating the mother's parental rights and granting the grandparents' adoption petition.[10] The mother now appeals.

The mother argues that the superior court erred by terminating her parental rights because the record lacks clear and convincing evidence of her parental unfitness. As noted above, the termination of the mother's parental rights is

---

[9] The mother filed an earlier petition to terminate the temporary guardianship in 2009, shortly after C. J. H.'s birth. That petition was dismissed for her subsequent failure to appear, apparently due to her incarceration and/or homelessness.

[10] The guardianship question remains open pending the outcome of the adoption proceeding.

predicated on a showing by the grandparents that the standard in former OCGA § 15-11-310 (a)[11] has been met, including the ground in this case:[12]

> [the] child is a dependent child due to lack of proper parental care or control by his or her parent, reasonable efforts to remedy the circumstances have been unsuccessful or were not required, such cause of dependency is likely to continue or will not likely be remedied, and the continued dependency will cause or is likely to cause serious physical, mental, emotional, or moral harm to such child.[13]

In addition to this ground, the superior court also must determine whether termination and adoption are in the best interest of the child.[14]

Here, it is undisputed that the mother suffers from a life-long mental condition that, when unaddressed by medication, has in the past impeded her parenting of C. J. H., and she has struggled with substance abuse. But it is also undisputed that since

---

[11] This Code section was amended in 2018, after the hearing and judgment in this case. See Ga. L. 2018, p. 935, § 3. As noted above, we apply the statute in effect at the time of the ruling.

[12] The grandparents do not contend that the mother has failed to comply with a child support decree nor that she has abandoned C. J. H. See OCGA § 15-11-310 (a) (3) & (4) (2017).

[13] (Punctuation omitted.) *In the Interest of A. F.*, 346 Ga. App. 538, 543 (816 SE2d 496) (2018) (quoting OCGA § 15-11-310 (a) (2017)).

[14] See OCGA § 19-8-10 (a) (2017).

7

entering and successfully completing the mental-heath court program, the mother has remained drug-free, has obtained and maintained stable housing, and has stabilized her mental health through medication and counseling. Further, with the help of the grandparents, she has established and maintained a bond with C. J. H. through regular visitation. Thus, despite the mother's difficulty in the past, the evidence shows substantial progress (as opposed to mere hope or promises) in establishing a loving and stable home environment.[15] If anything, she is a success story of the mental-health court diversion program.

Nevertheless, pretermitting whether this suffices to show that C. J. H. remains dependent or whether that dependency is likely to continue, this case is akin to those in which a child is placed in foster care due to his parent's lack of proper care.

> When a court assesses whether a child now in foster care is likely to suffer serious harm as a result of continued deprivation, the court must consider not only the likelihood of harm if the child remains indefinitely in foster care, but also the likelihood of harm if the child returns to the custody of his parent, notwithstanding that the deprivation persists. The [petitioners are] required to show that continued dependency will cause

---

[15] Compare *In the Interest of G. A. M.*, 302 Ga. App. 177, 178 (1) (c) (690 SE2d 472) (2010) ("The [terminating] court must base its decision on more than positive promises of good behavior which past conduct has proven will likely not be carried out.").

harm. Dependency will cause harm only if all of the options available to [the petitioners] short of termination — keeping the child in foster care, or returning the child to the parent — will themselves cause harm. The [petitioners] must show that both would cause harm. This Court has reversed termination orders due to a lack of evidence that the children would experience serious harm if they remained in foster care, even when the [petitioner] did show that the return of the child to the parent might well cause harm. In considering whether there is evidence that remaining in foster care will cause serious harm to a child, we have examined both (1) the extent to which instability and impermanency are currently causing specific harms to the child and (2) whether the parents current relationship with the child is itself detrimental.[16]

The superior court in this case found that "both physical and long term emotional harm are likely with the denial of the adoption to" the grandparents. But absent from the record is any evidence concerning "the extent to which [any perceived] instability and impermanency are currently causing specific harms to [C. J. H.], and whether, as a result of the dependency, [C. J. H.] would be harmed by remaining in [the care of the grandparents] indefinitely."[17] There was no testimony from a caseworker, counselor, psychologist, or guardian ad litem opining that harm

---

[16] (Punctuation omitted.) *In the Interest of A. F.*, 346 Ga. App. at 544.

[17] (Punctuation omitted.) Id. at 544-545.

would result from C. J. H. remaining with the grandparents in the current situation, nor was there any evidence that continuing a parental relationship, in some form, with the mother would harm C. J. H. To the contrary, the grandparents both testified that they do not prevent the mother from visiting C. J. H. at her will because they believe that C. J. H. needs a relationship with his mother. Notably, when asked whether it would harm C. J. H. to be returned to his mother, the grandfather testified he was "50 percent sure on it." Fifty percent does not rise to the level of a preponderance of the evidence, much less the higher standard of clear and convincing evidence, which is applicable here. In sum, there was no showing "regarding how continuing the status quo would harm the [child] in this case."[18]

It is undisputed that the mother has faced and always will face significant hurdles in her life. But the record here shows multiple years of unrefuted progress toward the mother's stabilization that has not been undermined by evidence of harm to C. J. H. It is also clear that none of the mother's progress nor C. J. H.'s stable lifestyle to date would have been possible without the care offered by the grandparents, and their commitment to C. J. H. and to the relationship between the mother and her son is commendable. C. J. H. is thriving in the care of his extended

[18] Id. at 545.

10

family, the mother has stabilized, and the parent and child at issue maintain a positive, healthy bond. This is not a case in which a child is lingering unnecessarily and indefinitely in foster care, facing impermanence and tenuous social bonds, and suffering emotional harm due to that instability.[19] Therefore, in light of the record before us, "the evidence was insufficient to support the trial court's conclusion that any continued dependency experienced by [C. J. H.] will cause or is likely to cause [him] serious physical, mental, emotional, or moral harm, and we therefore reverse."[20]

*Judgment reversed. Mercier, J., concurs. Dillard, C. J., concurs fully and specially.*

---

[19] Compare *In the Interest of C. L.*, 315 Ga. App. 607, 613 (1) (b) (727 SE2d 163) (2012) (recounting the evidence of harm to the children in their present circumstances of foster care, in which the children had nothing to gain by a relationship with their mother, and her visits negatively affected him).

[20] (Punctuation omitted.) *In the Interest of A. F.*, 346 Ga. App. at 545.

11

A18A1821. HEWLETT v. HEWLETT et al.                    DI-067


DILLARD, Chief Judge, concurring fully and specially.

I fully concur in the majority's thoughtful and well-reasoned opinion, but write

separately to reiterate my view that, regardless of any statutory provisions suggesting

otherwise, a parent's fundamental right to familial relations with her child may not

be terminated under either the federal or Georgia Constitutions[1] simply because that

---

[1] In acknowledging that parents have a fundamental constitutional right to familial relations with their children, the Supreme Court of the United States has primarily grounded this substantive right in the Due Process Clause of the Fourteenth Amendment. *See, e.g.*, *Meyer v. Nebraska*, 262 U.S. 390, 399 (43 SCt 625, 47 LEd 1042) (1923); *Stanley v. Illinois*, 405 U.S. 645, 651 (II) (92 SCt 1208, 31 LE2d 551) (1972). Other courts have identified the Ninth Amendment or other provisions of the Fourteenth Amendment as providing independent or arguably more appropriate constitutional bases for this fundamental right. *See, e.g.*, *Doe v. Heck*, 327 F.3d 492,

parent has not demonstrated to the government's satisfaction that she (1) is a model parent or (2) has "stable housing." Likewise, as the majority aptly notes, a judge is not permitted to terminate a parent's constitutional right to familial relations merely because her child has been in the care of a guardian (or foster care) for an extended period of time without a specific showing that this "uneasy status quo" is causing the child serious harm.[2] As I have repeatedly explained, a parent's constitutional right to

517-18 (II) (B) & n.22 (7th Cir. 2003) (Manion, J.). But regardless of the constitutional mooring for the right to familial relations, there is no doubt that this right was widely recognized and accepted by those who wrote and ratified our federal Constitution. *See id.*; 2 ST. GEORGE TUCKER, BLACKSTONE'S COMMENTARIES WITH NOTES OF REFERENCE TO THE CONSTITUTION AND LAWS OF THE FEDERAL GOVERNMENT OF THE UNITED STATES AND THE COMMONWEALTH OF VIRGINIA 446 (Birch & Small 1803) ("The duty of parents to provide for the maintenance of their children, is a principle of natural law."); 2 JAMES KENT, COMMENTARIES ON AMERICAN LAW 169 (O. Halsted 1827) (noting that "[t]he rights of parents result from their duties [to their children]," and "the law has given them such authority"); JOHN LOCKE, SECOND TREATISE OF GOVERNMENT, Ch. 6, § 71 (Hackett Publishing Co., Inc. 1980, originally published in 1690) ("This shews the reason how it comes to pass, that parents in societies, where they themselves are subjects, retain a power over their children, and have as much right to their subjection, as those who are in the state of nature."); *see also* GA. CONST. Art. I, § I, ¶ XXIX ("The enumeration of rights herein contained as part of this Constitution shall not be construed to deny to the people any inherent rights which they may have hitherto enjoyed.").

[2] *See Santosky v. Kramer*, 455 U.S. 745, 765-66 (III) (B) (102 SCt 1388, 71 LE2d 599) (1982) (noting that "[f]or the child, the likely consequence of an erroneous failure to terminate is preservation of an uneasy status quo[,]" whereas "[f]or the natural parents, . . . the consequence of an erroneous termination is the unnecessary destruction of their natural family"); *In the Interest of J. E.*, 309 Ga. App. 51, 69-70

familial relations with her child may not be terminated unless the State—or in this case the guardian—is able to demonstrate by clear and convincing evidence that the parent-child relationship, through the parent's actions or inaction, has been irretrievably damaged—*i.e.*, that the continuation of the parent-child relationship, as

(711 SE2d 5) (2011) (Dillard, J., dissenting) ("[A]ny determination that the continued deprivation will or is likely to cause serious physical, mental, emotional, or moral harm to a child must necessarily include a finding of serious harm or a likelihood of serious harm in maintaining the 'uneasy status quo[.]'" (punctuation & footnotes omitted)); *In the Interest of K. D. E.*, 288 Ga. App. 520, 526 (1) (654 SE2d 651) (2007) (reversing termination order, and in doing so, noting that "even if there were sufficient evidence before us to support a finding of continued deprivation, termination of the parental rights of the mother would not be warranted here because there is no evidence in the record that any continued deprivation is likely to cause physical, mental, emotional, or moral harm to the child," and that while "a caseworker gave general testimony in response to leading questions that the Department was concerned about the detrimental effects of foster care on the child, there was no evidence that the child was experiencing difficulties, such as behavioral or social issues, from being in foster care or that he would experience difficulties if a permanent placement was not put into place; and there was no testimony that a continued relationship with his mother would result in any potential or actual harm to the child"); *In the Interest of T. P.*, 270 Ga. App. 700, 706-07 (4) (608 SE2d 43) (2004) (reversing termination order, notwithstanding finding of continued deprivation, because "there was no testimony from any professional, or from any lay witness, that the child would [likely] suffer [serious] harm from the current situation[,]" and specifically "there is no indication that continued exposure to the mother will cause the child harm"); *see also In the Interest of J. K.*, 278 Ga. App. 564, 572-73 (629 SE2d 529) (2007) (Ruffin, J., concurring specially) (noting that a "finding of continuing deprivation is not enough to demonstrate that deprivation is harmful to the child," and that "these cases require affirmative evidence that the child will be seriously harmed by an ongoing parental relationship").

3

it presently exists with the child in the custody of a guardian or the State, is causing or is likely to cause the child serious harm.[3] Suffice it to say, no such showing was made in this case, and I agree with the majority that the trial court's judgment must be reversed.

---

[3] *See In Interest of R. S. T.*, 345 Ga. App. 300, 320 (812 SE2d 614) (2018) (Dillard, C.J., concurring fully and specially) ("[I]n considering any ground for terminating parental rights, including abandonment, a juvenile court must consider the overarching constitutional principle that termination is unauthorized unless a parent has, by her actions or inaction, forfeited her constitutional right to familial relations." (punctuation omitted)); *In the Interest of S. O. C.*, 332 Ga. App. 738, 747 (774 SE2d 785) (2015) ("[T]he juvenile court has no authority to sever the natural parent-child relationship simply because it believes the child would be better off with the foster family. Indeed, the juvenile court's preference that [the child] remain with his foster family is wholly without consequence, when the court lacked clear and convincing evidence to terminate the natural mother's parental rights." (punctuation & footnote omitted)); *In the Interest of C. J. V.*, 323 Ga. App. 283, 291 (746 SE2d 783) (2013) (Dillard, J., concurring fully and specially) ("[T]he State has no business facilitating the adoption of children entrusted to its care until and unless a parent has, by her actions or inaction, forfeited her constitutional right to familial relations. The State's primary goal must be to maintain and preserve the natural parent-child relationship." (punctuation omitted)). *Cf.* Richard W. Garnett, *Taking Pierce Seriously: The Family, Religious Education, and Harm to Children*, 76 NOTRE DAME L. REV. 109, 114 (I), 133 (III) (2000) ("[S]tate functionaries, guided and restrained by a proper humility about their authority and competence, should meddle with [the parent-child relationship] only to prevent harm, very carefully defined, to a child. That is, they should not intervene simply whenever they think intrusion or oversight would serve the Government's notion of the child's "best interests" or its own perceived need and claimed prerogative to create a certain kind of citizen . . . . *Pierce* [*v. Society of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510 (45 SCt 571, 69 LE2d 1070) (1925),] is a rejection of state omnipotence, not children's personhood.").