**FIFTH DIVISION**
**MCFADDEN, P. J.,**
**HODGES and PIPKIN, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**May 16, 2025**

# In the Court of Appeals of Georgia

A25A0241. IN THE INTEREST OF G. T. G. M., A CHILD.

HODGES, Judge.

The mother of two-year-old G. T. G. M. appeals from an order terminating her parental rights.[1] The mother argues that the juvenile court's decision was not supported by clear and convincing evidence because (i) she substantially complied with her case plans, and (ii) the Glynn County Division of Family & Children Services ("DFCS") failed to prove that any dependency is likely to continue or cause serious harm to the child. For the reasons explained below, we agree and reverse.

---

[1] The mother named a putative father, but DNA ruled out the named individual. The child's father remains unknown and any termination of his parental rights is not at issue in this appeal.

On appeal from an order terminating parental rights, this Court views the evidence in the light most favorable to the juvenile court's ruling and determines whether any rational trier of fact could have found by clear and convincing evidence that the parent's rights should be terminated. *In the Interest of B. R. J.*, 344 Ga. App. 465 (810 SE2d 630) (2018). In so doing, we give due deference to the trial court's findings of fact and do not weigh the evidence or determine witness credibility. *In the Interest of A. F.*, 346 Ga. App. 538 (816 SE2d 496) (2018). That said,

> this deferential standard of review is tempered by the fact that there is no judicial determination which has more drastic significance than that of permanently severing a natural parent-child relationship. It must be scrutinized deliberately and exercised most cautiously. The right to raise one's children is a fiercely guarded right in our society and law, and a right that should be infringed upon only under the most compelling circumstances.

(Citation omitted.) *In the Interest of B. R. J.*, 344 Ga. App. at 465. "Accordingly, it is not sufficient if the record merely contains some evidence to support the juvenile court's factual findings. Rather, the record must contain evidence that is 'clear and convincing.'" (Citation and punctuation omitted.) *In the Interest of M. R. B.*, 350 Ga. App. 595, 596 (829 SE2d 848) (2019) (physical precedent only).

So viewed, the record shows that the mother tested positive for opiates when G. T. G. M. was born in Texas in August 2022, and she admitted to using cocaine, marijuana, and methamphetamines during her pregnancy, though she claimed at trial that she was "forced to take and ingest" the cocaine and methamphetamines during a sexual assault. G. T. G. M. did not display withdrawal symptoms and appeared to be in good health, and the mother allowed the child's aunt to take the child to Brunswick, Georgia when he was discharged. The mother entered an inpatient treatment program in Texas, but less than a month later left against medical advice and checked herself into another inpatient facility in Brunswick. In October 2022, the mother stipulated that the child was dependent. Placement of the child subsequently was changed because the child's aunt tested positive for methadone. The mother attempted to withdraw her stipulation and object to the placement change, but that objection was ultimately withdrawn. In November 2022, the juvenile court adjudicated G. T. G. M. dependent, finding that the child had been abused or neglected and was in need of the court's protection based on the mother's substance abuse and prenatal substance abuse. The court ordered DFCS to prepare a case plan for the mother and placed custody of the child with DFCS.

In a November 2022 case disposition summary, DFCS listed the mother's goals as follows: (i) complete parenting classes; (ii) maintain clean and stable housing; (iii) remain drug and alcohol free; (iv) complete a psychological evaluation; (v) complete any recommended drug and alcohol counseling; (vi) complete any recommended mental health counseling or therapy; (vii) maintain regular employment or have income sufficient to support the family; (viii) support the minor child or children as required by law; (ix) maintain regular visitation with the child or children; (x) demonstrate an understanding of, and an ability to meet, the medical needs of the child or children; (xi) maintain contact with DFCS and inform it and the court of any change in address or telephone number within 72 hours of such change; and (xii) other discussed goals. In December 2022, DFCS completed a 75-day review summary which noted that "[a]ppropriate progress [was] being made by the mother . . . on her case plan[.]" Counselors reported that the mother "has been working consistently, and that she is very motivated[.]" The juvenile court subsequently entered anther disposition finding the child dependent, awarding DFCS temporary custody, and outlining the mother's goals.

In March 2023, DFCS completed a review summary, noting that although the mother had four negative drug screens, her substance abuse assessment recommended intensive outpatient treatment, and the mother had not completed that treatment. According to DFCS, the mother had enrolled in three inpatient substance abuse programs, but left two on her own accord and was discharged from one due to non-compliance; she was waiting to hear back from an outpatient program. The report further mentioned that the mother did not have safe and stable housing. That said, the mother still participated in counseling and parenting classes, regularly attended biweekly visits with the child, had stable income in the form of disability benefits, and had paid all her child support obligations. A case plan was filed with the review summary that once again outlined the mother's goals and specifically required, contrary to the assessment recommendation, inpatient substance abuse treatment. A court order adopted the case plan submitted by DFCS.

In May 2023, DFCS prepared a court summary document noting that the mother had completed all of her assessments, was participating in mental health and substance abuse counseling, attended regular biweekly visits with the child, had paid her child support, and had a stable income, but had produced two positive screens for

alcohol in April 2023, did not have stable housing (though she was on the wait list for low income housing), had a pending case in Cobb County,[2] and was pregnant but did not know the name of the father. The summary stated that DFCS was having a difficult time finding a substance abuse provider for the mother because she was "not active in her addiction and ha[d] numerous negative drug screens[.]" Due to its difficulty in finding a provider, DFCS requested another substance abuse assessment; the mother was finally tested after cancelling two appointments. The assessment found that the mother was not an appropriate candidate for inpatient or outpatient substance abuse treatment and recommended that she participate in a recovery support group. The mother participated in Alcoholics Anonymous sessions. The juvenile court subsequently entered the four-month judicial review order detailing the mother's progress and indicating that the permanency plan for the child was for reunification with the mother no later than September 2023.

In July 2023, DFCS submitted another case plan review. According to the review, the mother was actively working her case plan. The mother's case plan still called for inpatient substance abuse treatment, even though DFCS knew that the

---

[2] The mother's outstanding charges were subsequently dropped.

mother's new assessment stated that she was not an appropriate candidate for inpatient or outpatient substance abuse treatment because she had not used illicit drugs for an eight-to-nine month period. That said, the mother produced an unconfirmed positive screen for fentanyl in May 2023 and a positive screen for alcohol in June 2023. DFCS referred the mother for a hair follicle screen on June 11, 2023, but the mother was unable to complete this test because she had dyed her hair and shaved all the hair on the other parts of her body. DFCS requested that the mother refrain from dyeing her hair or shaving for several weeks so a sample could be obtained, but the mother did not comply, dyeing her hair a second time. Based on the mother's four positive alcohol and drug screens, DFCS recommended outpatient treatment at a minimum. It was also noted that the mother still had not shown stable housing.

On July 17, 2023, the juvenile court held a nine-month permanency review hearing. The juvenile court's order noted that the mother requested to appear by video conference and was given a link, but did not attend. The court found that the mother was noncompliant with a number of her case plan goals and stated that "[a]lthough the mother has actively participated in the case plan for reunification and has worked to improve her circumstances, immediate reunification is not feasible

because of the mother's failure to address her substance abuse and mental health issues and her failure to obtain stable housing." The child's special advocate recommended that a foster-to-adopt home be found for the child.

In September 2023, DFCS located a foster-to-adopt placement, and the child was moved to that home. On November 14, 2023, the mother sent an email to the court stating that she would begin treatment the following day and had been doing everything in her power to stay on track, work the necessary steps, and ensure the return of her son.

On December 29, 2023, approximately 14 months after G. T. G. M. was born and three months after he was moved to a foster-to-adopt placement, DFCS petitioned to terminate the mother's parental rights. The petition noted that the mother: (i) has a history of chronic unrehabilitated use of controlled substances that render her incapable of providing for the needs of the child; and (ii) has, without justifiable cause, failed for a period of six months or longer to maintain a parental bond with the child, provide for the care and support of the child as required by court order, maintain adequate housing for the child, contribute to support the child, or complete her reunification case plan goals. A DFCS case plan report issued that same day

detailed the following: (i) due to the mother's instability, consistent and random drug screens have not taken place; (ii) due to the mother's instability, consistent visitations have not taken place; (iii) the mother failed to make progress on her substance abuse treatment in that she had enrolled in a number of different programs (the last three being August 3-21, November 15-26, and December 14-26, 2023), but either left on her own or was discharged due to noncompliance; (iv) the mother failed to obtain adequate housing; and (v) the mother was $50 in arrears on child support payments. That said, the case plan also noted that the mother is "very attentive and nurturing during her visits [with G. T. G. M.] . . . [and] displays appropriate parenting skills and behaviors during the visits."

A DFCS permanency review summary issued shortly after the termination petition was filed indicated that the mother had negative drug screens upon entering the last few treatment centers, but a counselor at her last treatment center noted that the mother "continually stated that she was only there to 'check the boxes to get her son back and did not need to be there for herself.'" Regarding visitation and housing, the summary stated that visitations had not been taking place due to the mother's instability in housing; the summary listed a number of places where the mother had

9

lived, including out-of-state residences. DFCS stated that returning G. T. G. M. to his mother's care would be contrary to his welfare, citing that the mother

> needs to rehabilitate her substance abuse issues and manage her mental health so that she can provide appropriate care of and supervision to her son. She is in need of stable housing to avoid homelessness. Due to [her son's] age he is vulnerable and the lack of case plan progress the department cannot ensure [the child's] safety upon a return.

One of the child's counselors likewise expressed concerns about the mother's ability to parent, stating that the mother flees situations not going her way, makes impromptu decisions about who she stays with, and is "well versed in all the right things to say[.]" The counselor feared the mother would continue to be an unstable parent for her son until she dealt with her co-dependent personality. On January 8, 2024, the juvenile court held a permanency review hearing and issued an order reciting the above facts.

The mother subsequently attended an inpatient substance abuse treatment program from January 23, 2024 to February 28, 2024, but once again left against medical advice before completing the program.

On March 6, 2024, approximately five months after G. T. G. M. moved placements, a bonding and attachment assessment was performed for the foster

mother; the child was one-and-one-half-years-old at the time. A bonding assessment was scheduled for the mother, but it had to be cancelled because the caseworker did not know where the mother was and the mother told the caseworker she needed to be on bed rest with her pregnancy. The counselor who performed the bonding assessment for the foster mother noted that the child has a "[s]ecure [a]ttachment" to the foster mother and is thriving in her care. According to the counselor, G. T. G. M. "would benefit from the opportunity to be legally adopted to ensure he is able to achieve stability in a healthy living environment before he is negatively impacted from the uncertainty of lingering in foster care." The child's special advocate likewise recommended that the mother's parental rights be terminated and the child remain in his current placement.

Later that month, on March 29, 2024, the mother gave birth to another child in Toombs County, and that child lives with the mother. A Toombs County DFCS caseworker went to the mother's home to assess it and did not report any safety issues. However, according to the mother's caseworker in this case, the mother no longer lives at the address investigated by Toombs County DFCS.

On April 29, 2024, the juvenile court held a hearing on DFCS's termination petition. At the hearing, the mother's caseworker testified that the mother had two substance abuse assessments and neither recommended inpatient or outpatient treatment. Nonetheless, the DFCS case plan required the mother to complete an inpatient substance abuse program and she failed to do so. The mother attended seven or eight programs, but left most against medical advice and was discharged from two for not following the rules. The caseworker testified that this made the mother unrehabilitated because she did not secure the skills to deal with her drug and alcohol issues. That said, hair follicle and urinalysis tests performed prior to the termination hearing both came back negative for drugs. In addition, the mother had numerous negative drug tests at various substance abuse treatment centers. In fact, during her time with DFCS, the mother only had four positive screens — three for alcohol and one presumptive positive for fentanyl that was never confirmed — and those screens were between April and June 2023, after she had a miscarriage. The mother attended Alcoholics and Narcotics Anonymous meetings.

The caseworker testified that the mother also failed to secure safe and stable housing; she moved multiple times, including two out-of-state moves. In fact, the

court noted at the termination hearing that, including inpatient treatment facilities, the mother moved approximately 21 times in a two-year period. And although the mother "recently" produced a lease, the lease was not signed by the actual landlord of the property and the mother purportedly was facing a pending eviction. The caseworker noted that the mother kept her fairly up-to-date on her moves, but testified that a parent is supposed to have six months of stable housing and the mother in this case never had even one month.

The mother continuously requested visitation, though her frequent moves made it difficult for her to attend visitation with the child, and virtual visits were sporadic. According to the caseworker, she did not believe the mother had a bond with the child. A bond assessment was not performed on the mother; it was scheduled for five days before the original termination of parental rights hearing but the mother was on bed rest during the time it was scheduled. According to the caseworker, she did not think of scheduling the bonding assessment until it was nearly time for the hearing.

The caseworker further testified that the mother pays her child support, though sometimes she catches up by paying a lump sum. The mother also completed her assessments and participated in parenting classes and mental health and substance

abuse counseling, though the caseworker testified that the mother did not "actively engage[] in counseling" or apply the parenting skills. The caseworker believed that G. T. G. M. would be harmed if returned to his mother. According to the caseworker, the child "is at that extremely vulnerable age of children. We need to be certain that he has the stability upon return[,]" and DFCS would not be able to check on him if the mother continued to move frequently. The caseworker noted that the child currently is in a foster-to-adopt house where he is thriving, and he is well bonded with the foster parents.

The child's foster mother testified that visitations with the mother had been sporadic since G. T. G. M. was placed with her. According to the foster parent, the child has difficulty sleeping, cries, and is very clingy after visitations with his mother.

The mother testified that she completed all assessments and recommendations from those assessments. Although her case plan included inpatient substance abuse treatment, she has consistently claimed — as her assessments found — that she does not need inpatient treatment; she has maintained her sobriety on a regular basis and participates in other resources, including mental health counseling and Alcoholics and Narcotics Anonymous meetings. The mother would like more visitation, but

recognized that it was difficult when she lived out of state. According to the mother, she moved frequently because she chose the wrong people to live with and needed to remove herself from bad situations. She applied for and has been waiting for public housing in Brunswick for over a year. The mother testified that she was not currently ready to parent G. T. G. M. but requested a little extra time to "get it together."

The child's guardian ad litem recommended that the mother's parental rights be terminated due to her failure to maintain safe and stable housing and her failure to complete substance abuse treatment. He cautioned the court against allowing the mother additional time to meet her case plan goals, stating that he believed that would simply be a delay in permanency.

Following the termination hearing, the juvenile court terminated the mother's parental rights. The court found that G. T. G. M. is a dependent child due to the lack of proper parental care and control, based on the failure of the mother to successfully achieve the goals of her reunification case plans. According to the court's order, the child's dependency is likely to continue, will not likely be remedied, and will likely cause serious physical, mental, or emotional harm to the child. The court further found that the mother, without justifiable cause, failed significantly for a period of six

months or longer prior to the termination hearing to develop and maintain a parental bond with the child, provide for the care and support of the child, or comply with a court-ordered plan to reunite the parent with the child. Finally, the court concluded that terminating the mother's parental rights was in the best interest of the child.

This Court granted the mother's application for discretionary review, and the mother filed this timely appeal.

We note at the outset that the mother's brief states a number of facts without including citations to the record, or appropriate citations to the record, as required by our Court rules. See Court of Appeals Rules 25 (a) (5) ("At a minimum, the appellant's brief must include . . . [a] statement of the case . . . with appropriate citations to the record."), 25 (d) (1) (i) ("Each enumerated error shall be supported in the brief by specific reference to the record or transcript. In the absence of a specific reference, the Court will not search for and may not consider that enumeration."), and 25 (d) (2) (providing manner of citation to the record). We nonetheless have exercised our discretion to address the mother's enumerations of error.

1. A juvenile court's termination of parental rights involves a two-step process. First, the court must determine whether one of the five statutory grounds for

16

termination has been met. OCGA § 15-11-310 (a). Second, if any of the statutory grounds is met, the court must consider whether termination is in the child's best interest. OCGA § 15-11-310 (b).

In this case, the juvenile court proceeded under OCGA § 15-11-310 (a) (5), which provides that termination may be authorized where the court determines that

> [a] child is a dependent child[3] due to lack of proper parental care or control by his or her parent, reasonable efforts to remedy the circumstances have been unsuccessful or were not required, such cause of dependency is likely to continue or will not likely be remedied in the reasonably foreseeable future, and:
>
> (A) Returning such child to his or her parent is likely to cause serious physical, mental, moral, or emotional harm to such child or threaten the physical safety or well-being of such child; or
>
> (B) Continuation of the parent and child relationship will cause or is likely to cause serious physical, mental, moral, or emotional harm to such child.

---

[3] For purposes of OCGA § 15-11-310 (a) (5), a "[d]ependent child" is defined as a child who "[h]as been abused or neglected and is in need of the protection of the court … or [i]s without his or her parent, guardian, or legal custodian." OCGA § 15-11-2 (22) (A), (C).

When determining whether a child is dependent due to lack of proper parental care and control, the juvenile court must consider, inter alia, the following factors:

> (1) A medically verified deficiency of [the] parent's physical, mental, or emotional health that is of such duration or nature so as to render such parent unable to provide adequately for his or her child; (2) Excessive use of or history of chronic unrehabilitated substance abuse with the effect of rendering a parent . . . incapable of providing adequately for the physical, mental, emotional, or moral condition and needs of his or her child; . . . [and] (5) Physical, mental, or emotional neglect of his or her child or evidence of past physical, mental, or emotional neglect by the parent of such child or another child of such parent[.]

OCGA § 15-11-311 (a) (1), (2), (5). If the child is not in the custody and care of his or her parent, the court also must consider

> whether such parent, without justifiable cause, has failed significantly for a period of six months prior to the date of the termination hearing:
>
> (1) To develop and maintain a parental bond with his or her child in a meaningful, supportive manner;
>
> (2) To provide for the care and support of his or her child as required by law or judicial decree; and

(3) To comply with a court ordered plan designed to reunite such parent with his or her child.

OCGA § 15-11-311 (b). With these principles in mind, we turn to the case at hand.

2. The mother first asserts that the juvenile court erred in terminating her parental rights because the evidence shows that she substantially complied with her case plans. This claim lacks merit.

The mother notes in her appellate brief that she completed parenting classes, was engaged in mental health services, had steady income, was current on child support, continued to visit with G. T. G. M. when afforded the opportunity, has been on the wait list for Section 8 housing for a year, and had recently secured housing that another DFCS agency found suitable when the mother was investigated following the birth of her other child one month prior to the termination hearing. In fact, the mother argues that she fulfilled all her case plan requirements except attending an inpatient or outpatient substance abuse program and maintaining stability in housing. She further asserts, without any explanation, that her "attempts to fulfill the inpatient/outpatient substance abuse program, which was not recommended by her assessments yet remained a part of her case plan, arguably led to her instability in

housing." These assertions are not enough to overcome the clear and convincing evidence supporting the juvenile court's findings that the mother failed to comply with her case plan goals and that these failures amounted to physical, mental, or emotional neglect of the child sufficient to demonstrate that G. T. G. M. is a dependent child due to a lack of proper parental care and control. See OCGA §§ 15-11-310 (a) (5); 15-11-311 (a) (5).

While two substance abuse assessments found that the mother did not need inpatient or outpatient substance abuse treatment, inpatient treatment remained a critical part of her case plan after the mother had a presumptive positive test for a controlled substance and twice dyed her hair and shaved her body when DFCS requested a hair follicle substance abuse test. The mother admitted she did not meet her goal of completing an inpatient substance abuse program. In fact, over the nearly two years that DFCS was involved, the mother enrolled in seven or eight substance abuse treatment facilities but either left against medical advice or was discharged for failing to follow the rules. Clearly, the mother failed to comply with this case plan goal.

The mother's reunification case plan also required her to maintain stable housing. Again, the mother failed to do so and, during the termination hearing,

20

recognized her instability. Indeed, in the nearly two years that DFCS was involved, the mother moved from place to place approximately 21 times. Although she produced a lease at the termination hearing, the mother's caseworker testified at the hearing that the lease was not signed by the landlord and that the mother would be facing eviction. It was for the juvenile court to credit or discredit this testimony, and "acquiring [housing] only . . . weeks before the termination hearing after years of housing insecurity . . . does not come close to the goal of maintaining stable housing." (Emphasis omitted.) *In the Interest of D. C. S.*, 371 Ga. App. 186, 200 (2) (b) (ii) (899 SE2d 834) (2024); see also id. at 201 (2) (b) (iii) ("last-minute efforts to obtain stable housing . . . are of questionable significance and sincerity") (citation and punctuation omitted). As the caseworker noted, six months of housing stability is the goal, and DFCS had not "gotten one month out of [the mother] throughout this case."

This lack of stability in housing also caused the mother to miss numerous visits with the child, and the mother admitted at the termination hearing that her moving and lack of stability had a negative effect on both her and the child. In addition, the mother's caseworker testified at the termination hearing that although the mother completed her assessments and participated in parenting classes and mental health

21

and substance abuse counseling, she did not "actively engage[] in counseling" or apply the parenting skills.

In short, while the mother did present some evidence that she completed a number of her case plan goals, the evidence, when viewed in the light most favorable to support the juvenile court's findings, was sufficient to authorize the juvenile court's conclusion that G. T. G. M. was dependent due to the mother's lack of proper parental care and control. See *In the Interest of B. R. J.*, 344 Ga. App. at 465. That, however, does not end our inquiry.

3. The mother next asserts that DFCS failed to prove that any dependency is likely to continue or cause serious harm to G. T. G. M. Pretermitting whether, as the mother argues, *expert* testimony regarding harm to the child is required, we are constrained to agree with the mother that there is no clear and convincing evidence establishing the requisite harm to G. T. G. M.

As stated previously, when a court finds that a child is dependent due to a lack of proper parental care or control by his parent, the juvenile court must assess whether:

(A) Returning such child to his or her parent is likely to cause serious physical, mental, moral, or emotional harm to such child or threaten the physical safety or well-being of such child; *or*

(B) Continuation of the parent and child relationship will cause or is likely to cause serious physical, mental, moral, or emotional harm to such child.

(Emphasis supplied.) OCGA § 15-11-310 (a) (5). We conclude that the trial court's order and the evidence presented at the termination hearing fail to detail clear and convincing evidence to support either prong.

The only harm to the child specifically noted by the juvenile court in its order is harm to G. T. G. M. as a result of "foster care drift" in the form of "doubt, uncertainty, and hesitancy in life," and the mother's failure to successfully achieve the goals of her reunification case plans. The juvenile court's order makes no specific finding that (a) returning G. T. G. M. to his mother is likely to cause serious physical, mental, moral, or emotional harm to him or threaten his physical safety or well-being or (b) continuation of the parent and child relationship is likely to cause serious physical, mental, moral, or emotional harm to G. T. G. M. "An order terminating parental rights must contain explicit findings supporting the conclusion of serious

physical, mental, moral, or emotional harm to the child." *In the Interest of N. E. K.*, 367 Ga. App. 50, 54 (1) (b) (885 SE2d 34) (2023).

> Indeed, the propriety of a termination order is inextricably intertwined with one of this republic's oldest and most sacred fundamental liberties — the right to maintain familial relations and integrity. To this end, a mere recitation that this legal requirement was met will not suffice. Instead, the juvenile court must ascertain the facts and state not only the end result of that inquiry but the process by which it was reached.

(Citation omitted.) Id. Here, "the [juvenile] court did not assess the extent to which instability and impermanency are currently causing specific harms to" G. T. G. M. *In the Interest of A. F.*, 346 Ga. App. at 544-545. Instead, the court simply "recit[ed] the legal standard without any factual underpinning." *In the Interest of R. S. T.*, 345 Ga. App. 300, 310 (3) (812 SE2d 614) (2018) (physical precedent only).

Moreover, the only testimony at the termination hearing specifically detailing potential harm to G. T. G. M. came from the mother's caseworker, who testified that the child would be harmed if returned to the mother because DFCS could not follow up due to the mother's constant moves and could not assess the mother if she did not live in Glynn County. Absent from the record is any evidence concerning the extent to which the mother's transiency is likely to cause specific serious physical, mental,

24

moral, or emotional harm to G. T. G. M. or any particular threat to the child's physical safety or well-being other than the mother's transiency. We can locate no case and DFCS has not pointed to any case where transiency alone is sufficient to demonstrate the requisite harm to sever the parent child relationship. In addition, there is little evidence in the record before us that continuing a parental relationship, in some form, with the mother is likely to cause serious physical, mental, moral, or emotional harm to the child while he remains in his foster care home. See *In the Interest of N. E. K.*, 367 Ga. App. at 55 (1) (b). While the foster parent testified that G. T. G. M. appeared more clingy and would awaken at night after visits, "there was no testimony at all from any witness about the effects, harmful or otherwise, of foster care on the child[] in relation to [his] dependency" to support the juvenile court's findings in its order. *In the Interest of A. F.*, 346 Ga. App. at 545.

Indeed, this is not a case where the mother has serious mental health or substance abuse issues. No evidence was presented that the mother had "[a] medically verified deficiency of [her] physical, mental, or emotional health that is of such duration or nature so as to render such parent unable to provide adequately for his or her child[.]" OCGA § 15-11-311 (a) (1). The mother receives mental health

counseling, and there was no indication at the termination hearing that any mental health issues would likely harm the child. Likewise, the record lacks evidence that the mother has "[e]xcessive use of or history of chronic unrehabilitated substance abuse with the effect of rendering [her] incapable of providing adequately for the physical, mental, emotional, or moral condition and needs of . . . her child[.]" OCGA § 15-11-311 (a) (2). Although the mother did not meet her case plan goal of completing an inpatient substance abuse treatment program, the mother's caseworker testified that the mother had two substance abuse assessments and neither recommended inpatient or outpatient treatment. In addition, during her time with DFCS, the mother only had three positive screens for alcohol and one presumptive positive screen for fentanyl that was never confirmed, and those screens were between April and June 2023, after she had a miscarriage. The mother had numerous negative drug tests at various substance abuse treatment centers, including her last few treatment centers, and hair follicle and urinalysis tests prior to the termination hearing both came back negative for drugs. The mother also attended Alcoholics and Narcotics Anonymous meetings.

Moreover, the child in this case is young and was moved to his current foster-to-adopt home in September 2023, just over six months prior to the termination

hearing in this case. Although a bonding assessment between the foster parent and the child was completed, a bonding assessment between the mother and the child, scheduled just prior to the termination hearing, could not be completed because the mother was eight months pregnant and on bed rest. DFCS made no further attempts to schedule a bonding assessment with the mother, and there was little evidence that the mother failed to "develop and maintain a parental bond with his or her child in a meaningful, supportive manner[,]" see OCGA § 15-11-311 (b) (1), or that the mother failed to "provide for the care and support of . . . her child as required by law or judicial decree," see OCGA § 15-11-311 (b) (2).

Finally, although the mother's housing instability is well-documented, the Toombs County DFCS investigated the mother's suitability following the birth of her child a month before the termination hearing and left the newborn in the mother's care. While the termination of parental rights is dependent on the circumstances of each individual child, the fact that the mother was found suitable to maintain custody of her newborn, in conjunction with the mother's lack of substance abuse or mental health issues and DFCS' failure to conduct a bonding assessment between the mother and G. T. G. M., demonstrate a lack of serious harm in returning the child to the

mother or continuing the parent and child relationship with the mother. See *In the Interest of K. N. C.*, 264 Ga. App. 475, 480 (3) (a) (590 SE2d 792) (2003) (finding that the mother's conduct toward one child is relevant to whether the deprivation of her other children was likely to continue).

We are, of course, troubled by the mother's unstable housing and failure to complete all of her case plan goals, and we recognize that children should not be required to linger unnecessarily and indefinitely in foster care. See *In the Interest of A. F.*, 346 Ga. App. at 545. We also recognize that the mother's parental rights may ultimately be terminated in the future. However, "[w]hile we are reluctant to reverse the juvenile court's determination, no judicial determination is more drastic than the permanent severing of the parent-child relationship." (Citation and punctuation omitted.) *In the Interest of D. S.*, 285 Ga. App. 752, 757 (647 SE2d 417) (2007). Because the evidence is not clear and convincing based on the record before us that (a) returning G. T. G. M. to his mother is likely to cause serious physical, mental, moral, or emotional harm to him or threaten his physical safety or well-being or (b) continuation of the parent and child relationship is likely to cause serious physical,

mental, moral, or emotional harm to G. T. G. M., we are required to reverse the juvenile court's termination of the mother's parental rights.

4. Based on our holding, we need not reach the mother's argument that a termination of her parental rights constituted a deprivation of her constitutional rights.

*Judgment reversed. McFadden, P. J., and Pipkin, J., concur.*